**In re HANSON INDUSTRIES,
INC., Debtor.**

**Bankruptcy No. 4–87–1478.**

United States Bankruptcy Court,
D. Minnesota.

Aug. 18, 1988.

William Fisher, Thomas Darling, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for Bank of New England.

Joseph Dicker, Charles Dietz, Larkin, Hoffman, Daly & Lindgren, Minneapolis, Minn., for Steven Hanson.

Melvin Orenstein, Lindquist & Vennum, Minneapolis, Minn., for Lindquist & Vennum.

Sheri Ahl, Faegre & Benson, Minneapolis, Minn., for Phillips Petroleum Co.

William Luther, Luther, Ballenthin & Carruthers, Minneapolis, Minn., for Heitzig plaintiffs.

Kathryn Page, Wagner, Johnston & Falconer, Minneapolis, Minn., Trustee.

## MEMORANDUM ORDER

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned on the 6th day of April, 1988, and on the 3rd day of May, 1988, on (i) an application of the Bank of New England, N.A. ("the Bank") by and through its attorneys, Gray, Plant, Mooty, Mooty & Bennett, P.A. ("Gray, Plant"), for an order allowing and authorizing the payment of administrative expenses pursuant to 11 U.S.C. §§ 503(b)(3)(A) and 503(b)(4), (ii) an application by 35 former employees of debtor ("the Heitzig plaintiffs"), by and through their counsel, Luther, Ballenthin & Carruthers ("Luther, Ballenthin") for an order allowing and authorizing the payment of administrative expenses pursuant to 11 U.S.C. §§ 503(b)(3)(A) and 503(b)(4); and (iii) a motion by the law firm of Lindquist & Vennum for allowance of its claim for attorneys fees and costs pursuant to 11 U.S.C. §§ 507(a)(2) and 502(f). Kathryn Page ("trustee") appeared *in propria persona;* William Fisher and Thomas Darling represented the Bank; Joseph Dicker and Charles Dietz represented Steven Hanson ("Hanson"); Melvin Orenstein represented Lindquist & Vennum; Sheri Ahl represented Phillips Petroleum Co; and William Luther represented the Heitzig plaintiffs. The United States Trustee filed written objections to a portion of the application of the Heitzig plaintiffs but did not make an appearance.

The court has jurisdiction to hear and decide these applications pursuant to 28 U.S.C. §§ 1334 and 157, and Local Rule 103(b). These are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A).

## FACTS

### A. Procedural History

I have the rather unwelcome task of passing on requests for attorneys fees and costs arising out of one of the most complex and difficult involuntary bankruptcy cases in this district in recent years without having had the benefit of presiding at the time. Consistent with my obligations to carefully assess and review all fee applications in bankruptcy cases I have therefore examined the docket and papers in this bankruptcy case, which is now measured by weight of its papers, as well as the file in a pending adversary proceeding (*Bank*

*of New England, N.A. v. Hanson Indus., Inc.,* 83 B.R. 659 (Bkrtcy.D.Minn.1988)). The following brief procedural history is helpful to understanding my ruling on these requests for relief.

Debtor, Hanson Industries, Inc. ("debtor") was for nearly a decade, a successful basic processor of resin for the roto molding industry with a plant located in Fridley, Minnesota. It was owned, operated and managed by Hanson. In the summer of 1985 the Bank became debtor's principal lender and, as a result, advanced over $2 million to debtor and to Hanson, taking in return a secured interest in virtually all of debtor's and Hanson's property. The relationship remained stable until the spring of 1986 when debtor experienced substantial financial difficulties.

In late May, 1986, the Bank first learned that debtor was approximately $400,000.00 overadvanced; debtor expected to suffer excessive and unanticipated losses; debtor had been untruthful with respect to at least one major account; and debtor had presented false, incomplete or inaccurate monthly recapitulation reports to the Bank. The Bank then offset the balance in debtor's checking account with it against indebtedness due to the Bank and took other steps to protect its security. Thereafter debtor experienced severe limitations on the nature and volume of its business and the layoff of a number of its employees. A period of charges and countercharges between the Bank and debtor followed.

In August of 1986, the Bank commenced an action in state court seeking to recover its debt and to foreclose on its security. Debtor resisted and counterclaimed alleging a number of theories including breach of contract and lender liability. During the course of that action, the Bank obtained a prejudgment injunction order in an attempt to protect against suspected wrongful diversion of corporate assets. The Bank was represented in the state court action by Gray, Plant and debtor was represented by Lindquist & Vennum.

In November of 1986, debtor, Hanson, and others were sued by the Heitzig plaintiffs in state district court for claims arising out of their termination by the debtor. The Heitzig plaintiffs were represented by Luther, Ballenthin.

By order dated January 16, 1987, the Heitzig plaintiffs' state court suit and the Bank's state court suit were consolidated for all purposes and assigned to one judge. There followed considerable discovery activity in the consolidated case during which Gray, Plant and Luther, Ballenthin worked closely together to jointly develop the facts. These activities developed considerable information demonstrating potential suspected widespread diversion of corporate assets by Hanson to himself and a family member. These findings became the impetus for filing an involuntary petition in bankruptcy on May 1, 1987, by the Heitzig plaintiffs and the Bank.

It is undisputed that at the time of the filing debtor was not paying its bills as they came due, had been essentially out of business for nearly one year, and had virtually no assets. The filing of the petition was followed by a flurry of activity which culminated in entry of the order for relief on July 23, 1987. In general, this activity included:

(1) A motion by the petitioning creditors to appoint an interim trustee based on their claim and belief that Hanson was looting or diverting the corporate assets and which was denied early on in the case.

(2) A motion by the petitioning creditors for summary judgment on their complaint.

(3) A motion by the debtor to dismiss the petition on numerous grounds including a claim that there were an inadequate number of qualified petitioners signatory to the complaint and that the complaint was not properly verified.

(4) A motion to abstain brought by the debtor based on the debtor's position that it had its own separate workout plan and reorganization and that abstention would be in the best interest of the creditors, and

(5) A motion by the debtor to remand the consolidated state court action which had been removed by the plaintiffs to Bankruptcy Court shortly after the filing of the involuntary petition.

Rather than converting to chapter 11, which was an option, debtor chose to vigorously defend the petition for involuntary bankruptcy. Between the filing of the petition and the entry of the order for relief, the parties engaged in extensive discovery. They took eight depositions and exchanged written discovery. There were some unresolved discovery disputes which required court intervention. The court held four hearings on motions and conducted two days of evidentiary hearings relating to the involuntary petition. All of this culminated in the court's granting the petitioning creditors summary judgment on their complaint, denying the debtor's motion to abstain and the entry of an order for relief dated July 23, 1987.[1]

It is clear that both sides treated this case as important and unique. The debtor asserted virtually every possible defense to the filing of the involuntary petition. Its motion to dismiss was based on grounds of bad faith, lack of sufficient number of creditors without a bona fide dispute, and alleged improper verification. Its motion to abstain under 11 U.S.C. § 305 was based on its attempt to arrange a reorganization outside bankruptcy which was first developed after the filing of the petition and which contemplated a capital infusion from a source which subsequently failed to materialize. These defenses and responses raised significant factual and legal issues for the petitioning creditors. Discovery was conducted relating to issues such as whether the Bank had improperly solicited creditors; whether the purported workout arrangement outside bankruptcy was feasible and in the best interests of creditors; whether the petitioning creditors' claims

were in bona fide dispute; and whether Hanson had engaged in preferential transfers or diversion of corporate assets. At times the debtor was especially litigious, as for example when Hanson refused to answer questions during his deposition, causing the Bank to move to compel responses after which the debtor did furnish the requested information. Also, perhaps to further confound the petitioning creditors, debtor attempted to depose counsel for the Heitzig plaintiffs and, at times, simply refused to cooperate in order to ease the cost being incurred by both sides. The debtor raised many issues and defenses which, in retrospect, were of extremely doubtful value to prompt resolution of the dispute in the best interests of the creditors of the debtor. Following entry of the order for relief defendant failed originally to file schedules, as a result of which the petitioning creditors began to prepare their own set of schedules.[2]

These activities have produced the following requests for fees and costs:

1. Gray, Plant and its client, the Bank, seek an administrative expense award of $40,000.00. This is reduced from the original claim of $55,342.92 which was made up of the following components:

(a) $2,679.07 incurred by the Bank in travel expenses for employees who traveled to and from Boston in connection with hearings and preparation of the case;

(b) $45,347.25 in attorneys fees of Gray, Plant incurred between April 24, 1987 and August 18, 1987; and

(c) $7,316.60 for costs and disbursements incurred at Gray, Plant on be-

---

1. At a later point in time the motion to remand came on for hearing before the Honorable Robert J. Kressel. The motion was granted by order dated January 20, 1988. An appeal was taken and is currently pending in the United States District Court. While the appeal was pending, this court, by order dated July 19, 1988, approved a settlement between the Bank and the debtor.

2. During the later course of this bankruptcy proceeding, Hanson has taken a number of actions which demonstrate a continuing excessively zealous attitude towards these entire proceed-

ings and which have made the trustee's task of garnering and disposing of the assets especially difficult. Hanson interfered with the trustee's attempt to auction the assets of the debtor. On at least three occasions now he has failed to turn over keys which would allow the trustee or creditors access to debtor's property. Most recently, Hanson has been called upon to answer to this court's order to show cause why he should not be held in contempt for failing to respond to a court order requiring him to make certain secured property available for inspection by the Bank, a secured creditor.

half of the Bank in connection with the involuntary petition proceedings.

2. Luther, Ballenthin and its clients, the Heitzig plaintiffs, seek an administrative expense award of $15,825.05 made up of

(a) $14,747.75 for attorneys fees of Luther, Ballenthin incurred between September 7, 1986 and July 24, 1987, and

(b) $1,077.30 in costs and disbursements incurred at Luther, Ballenthin on behalf of the Heitzig plaintiffs in connection with the involuntary proceedings.

3. Lindquist & Vennum seeks an award on Claim No. 108 which in part seeks payment for legal services rendered between May 1, 1987 and July 23, 1987 in the sum of $62,734.71 incurred during the involuntary "gap" period. Lindquist & Vennum asserts that it is entitled to secured priority status under 11 U.S.C. § 507(a)(2) because these expenses were incurred in the ordinary course of business under 11 U.S.C. § 502(f).

I have determined to allow the application of the Bank in the total sum of $40,000.00 and the application of the Heitzig plaintiffs in the sum of $6,807.89 as administrative expenses pursuant to 11 U.S.C. §§ 503(b)(3)(A) and 503(b)(4). I have further determined to allow Lindquist & Vennum's claim for gap period fees and expenses secured by priority status under 11 U.S.C. §§ 507(a)(2) and 502(f) to the extent of $12,394.52, but otherwise am allowing the claim to be treated solely as an unsecured claim to the extent of $50,340.19.

### DISCUSSION

#### A. *Applications of the Bank and the Heitzig Plaintiffs*

I am treating these applications together because they are based on like statutory provisions; i.e., 11 U.S.C. §§ 503(b)(3)(A) and 503(b)(4).

Section 503 of title 11 provides that, under certain circumstances, administrative expenses may be allowed by the court. These expenses receive first priority of payment in a bankruptcy case. *See* 11 U.S.C. § 507(a)(1). The expenses of a petitioning creditor in an involuntary bankruptcy proceeding are included as administrative expenses pursuant to 11 U.S.C. § 503(b)(3)(A). That section provides in pertinent part:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under 502(f) of this title, including—

\* \* \* \* \* \*

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection incurred by—

(A) a creditor that files a petition under section 303 of this title.

*Id.* In addition, under section 503(b)(4) a petitioning creditor may receive compensation for its attorneys fees and costs incurred by the attorney. Section 503(b)(4) grants administrative expense treatment to:

(4) reasonable compensation for professional services rendered by an attorney or accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorneys or accountant.

11 U.S.C. § 503(b)(4).

■ It is well settled that these statutory provisions must be narrowly construed, in order to keep fees and administrative expenses at a minimum so as to preserve the estate for the benefit of all creditors. *In re OPM Leasing Services, Inc.,* 23 B.R. 104, 121 (Bktcy.S.D.N.Y.1982). Applicants under section 503(b)(3) and (4) have the burden of establishing their entitlement to an award by a preponderance of the evidence. *In re 1 Potato 2, Inc.,* 71 B.R. 615, 618 (Bktcy.D.Minn.1987); *In re Patch Graphics,* 58 B.R. 743, 746 (Bktcy. W.D.Wisc.1986). As with all fee applications in bankruptcy cases, the applications

must be supported by detailed time sheets and records and information relating thereto.

### 1. The Bank's Application

The Bank's application seeks costs and fees incurred between April 24, 1987, the date upon which the petition was drafted, and August 18, 1987, the last date the Gray, Plant firm worked on preparation of schedules in anticipation the debtor would not file them. During this time, Gray, Plant attorneys and legal assistants spent 479.40 hours of time at billing rates which ranged from $145.00 per hour to $42.00 per hour. I have two principal issues to decide with regard to this application. First, I must determine whether the Bank is entitled to be awarded anything over and above its fees and costs incurred in preparing and filing the petition. Second, I need to address the merits of whether the work done and expenses incurred were excessive when judged by the statutory criteria.

█ For the following reasons, I resolve the first question in favor of the allowance of fees for more than just preparation and filing of the petition. Formerly, under the Bankruptcy Act of 1898, there was considerable authority for the view that only services actually rendered in preparing and filing an involuntary petition were deemed reimbursable, and that all other expenses were to borne by the petitioning creditors and not the estate. *See, e.g., Calhoun v. Stratton,* 61 F.2d 302, 303 (6th Cir.1932); *In re Consolidated Factors Corp.,* 59 F.2d 193, 194 (2d Cir.1932). *Cf. Morse & Tyson v. Irving–Pitt Mfg. Co.,* 18 F.2d 692, 695 (8th Cir.1927) (interpreting Bankruptcy Act § 64(b) (the forerunner of § 503(b)(3)(A) and 503(b)(4)) as allowing fees and costs for services actually rendered in filing the petition and prosecuting it to adjudication of the bankrupt). Certain cases decided since the enactment of the 1978 Bankruptcy Code have taken the view that a narrow reading of the rights of petitioning creditors has carried forward into the Bankruptcy Code itself. *See, e.g., J.V. Knitting Serv., Inc.,* 22 B.R. 543, 545 (Bktcy.S.D.Fla.

1982); *In re Seatrain Lines, Inc.,* 21 B.R. 194, 195–96 (Bktcy.S.D.N.Y.1982).

More recent authority rejects the notion that applications should be so limited. *See, e.g., In re Baldwin–United Corp.,* 79 B.R. 321, 337 (Bktcy.S.D.Ohio 1987) (a limited reading is "out of step with the realities" and unrealistic especially in light of the newly enacted damage provisions in 11 U.S. C. § 303(i)); *In re Rorabaugh,* 62 B.R. 623, 627–28 (Bktcy.D.Kan.1986) (allowing compensation for work involved in the initiation of the involuntary bankruptcy case and for work performed by counsel in substantial efforts made during the bankruptcy case, including preparation of schedules and the statement of affairs of the debtor when debtor was unable to do so). *See also* 3 *Collier on Bankruptcy* ¶ 503.04[4] (L. King 15th ed. 1988) (the professional services contemplated by section 503(b)(4) are those "leading to the entry of an order for relief in a liquidation case under chapter 7").

The more reasoned approach in a case such as this is to allow fees and costs incurred by the petitioning creditor for work directly related to the preparation of the petition and, if there is opposition, to reasonable and necessary efforts to pursue the petition to successful conclusion by entry of the order for relief. Such a reading is consistent with the concept that the purpose of allowing the petitioning creditors their attorneys fees and costs is to encourage them to successfully bring the debtor into court so that there may be equitable marshalling and distribution of its assets before they are squandered by the debtor. *See, e.g., In re J.V. Knitting,* 22 B.R. at 545.

I next reach the questions of whether the expenses of the Bank and Gray, Plant were actual and necessary and whether the fees of Gray, Plant are "reasonable ... based on the nature, the extent and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title ...." 11 U.S.C. § 330. Even though no party has a continuing objection to the Bank's application, I have an obligation to review

it with these criteria in mind. *See, e.g., In re Nucorp Energy, Inc.,* 764 F.2d 655, 658 (9th Cir.1985); *In re First Guaranty Venture Corp.,* BKY No. 4–82–599 (Bktcy.D. Minn. May 12, 1988) [available on WEST-LAW, 1988 WL 102819]. Therefore, I have reviewed this application, as I do all fee applications contested or otherwise, with a careful view toward efficiency and, where possible, cost containment.

█ On the merits, this fee application is limited in time to the date between preparation of the petition and the last date the firm worked on preparation of schedules for the debtors. It does, to some extent, suffer from deficiencies. For example, there are excessive amounts of interoffice conferencing between counsel in the firm, sometimes with three or four attorneys involved; an extraordinary amount of legal assistants' time booked in solid blocks; and several instances of attendance by more than one attorney at a hearing in court. Travel time has been booked at full hourly rates. And, there are some instances of what might be viewed as excessive expenses for travel and for disbursements listed by the law firm itself. All of these practices are of doubtful allowance by this court.

But, as part of a Stipulation, Release and Agreement entered into between the trustee and the Bank, which has now been approved by this court, the Bank has agreed to reduce its claim from $55,342.92 to $40,-000.00.[3] This substantial discount against billed fees and expenses more than compensates for the deficiencies in the application which I note. In further support of the $40,000.00 award, I should comment that the attorneys for the Bank achieved excellent results at hourly rates which are consistent with hourly fees obtained in this area by counsel performing comparable

services in other than a bankruptcy context. Because of the many defenses raised by debtor to the petition, most of which stretched the bounds of existing law, this became complex litigation. From the record I have reviewed it seems that the efforts of the Bank and its counsel have preserved what little was left of an estate following diversions of corporate assets by Hanson. The Bank has, therefore, performed an overall service for the creditors and for this system. It is also important to note that a great portion of the Bank's expenses and fees were incurred in response to debtor's zealous defense against the involuntary petition. Thus, while the fee award is substantial, it is justified in this case.

### 2. The Heitzig Plaintiffs' Application

█ Luther, Ballenthin seeks fees, costs and expenses incurred by attorneys and legal assistants at the Luther, Ballenthin law firm for a time period beginning in September of 1987 and concluding on July 24, 1987. The case trustee and the United States Trustee object to the award of fees and costs incurred at any period of time prior to a date immediately preceding the filing of the petition, arguing that those services were not incurred in connection with the involuntary proceeding and were not of benefit to the estate.

I agree that no time and expenses prior to late April, 1987, are compensable as administrative expenses in this bankruptcy estate and accordingly I have deducted $8,312.75 in fees incurred prior to April 22, 1987, and $704.41 in expenses incurred prior to April 9, 1987.[4] I recognize that in making this application Luther, Ballenthin has commendably attempted to segregate out the time attributable to projected bankruptcy matters from services and costs at-

---

3. Paragraph 14 of the Agreement provides: Estate agrees to pay Bank $40,000.00 for its attorneys fees in connection with the Involuntary Bankruptcy action commenced against Hanson Industries, Inc. upon approval by the United States Bankruptcy Court of this stipulation, release and agreement and approval of such fees. Bank agrees upon such reimbursement it will not make any administrative expense claim for such fees and expenses. In

the event that said fees and expenses are not approved, the Bank, in its sole discretion, may void this agreement in whole or in part.

4. The fee deduction is attributable to 41.30 hours of time of William Luther, 39.90 hours of time of Rita Sage, and 2.15 hours of an unidentified person ("B"), whose time I have assumed to have been charged at $150.00 per hour.

tributable solely to the Heitzig plaintiffs' litigation prior to late April, 1987. I also accept, as the trustee concedes, that some of the evidence developed by Luther, Ballenthin between September 1986 and late April 1987 in the Heitzig plaintiffs' state court case appears to have been helpful in deciding whether to commence an involuntary petition and was of some value in securing an order for relief over debtor's objection. But, there is simply no way to compensate the petitioning creditors for services and expenses rendered so remote in time to the filing of the petition itself, even though, as Luther, Ballenthin argues, "bankruptcy was always an option" as they pursued their action in state court between September 1986 and April 1987. I cannot award an administrative expense for activities so temporally remote to the actual filing of the petition, even though those activities tangentially benefitted the estate.

■ I have reviewed the timesheets submitted by Luther, Ballenthin for the period of time April 23, 1987 through July 24, 1987. During this period of time, attorneys and legal assistants at Luther, Ballenthin devoted 68.1 hours to the case at billing rates which ranged from $150.00 per hour to $25.00 per hour. The timesheets submitted in connection with the application reflect that much of this time was devoted to separate consultation and communication with the Heitzig plaintiffs and that duplication of effort between services being performed by the Bank's counsel and services being performed by Luther, Ballenthin was minimal. The mere fact that several attorneys are representing petitioning creditors does not foreclose an award of administrative expenses to each of them, so long as there is a definite effort to avoid duplicative work and to represent all petitioning creditors on an efficient basis. *See Baldwin-United*, 79 B.R. at 337. As best I can discern, to the extent there was duplication of effort, it was a necessary result of the considerable efforts being expended

by all petitioning creditors to respond to the many arguments being made by the debtor in opposition to the filing of the petition. I decline to reduce this application further and I find that the services rendered by Luther, Ballenthin following April 23, 1987 meet the statutory criteria.

I therefore determine to allow the Heitzig plaintiffs an administrative expense claim for attorneys fees incurred from and after April 23, 1987, and expenses from and after April 9, 1987, in the total amount of $6,807.89.

### B. Motion by Lindquist & Vennum

As of May 1, 1987, debtor owed the law firm of Lindquist & Vennum $23,394.09 for services rendered on its behalf prior to the filing of the bankruptcy petition. Between May 1, 1987, and July 23, 1987, debtor became further indebted to Lindquist & Vennum for services rendered with respect to several different matters in the total sum of $62,734.71.[5] During that period of time attorneys and legal assistants at Lindquist & Vennum expended 453.2 hours of time at an average billing rate of $134.00 per hour in defense of the involuntary petition and on other matters. Lindquist & Vennum's timesheets reflect that time was devoted to the following matters during the involuntary gap period: 001, Creditor issues; 003, Litigation with Dow Chemical; 010, Weldun Dunn arbitration; 013, State Court litigation with the Bank; 015, Bankruptcy matters; 019, the Heitzig plaintiffs' lawsuit in state court; 021, the involuntary bankruptcy proceedings; and 023, general corporate matters. Lindquist & Vennum has filed Claim No. 108 in the total amount of $86,128.81 (as amended) made up of $23,394.09 in prepetition debt and $62,734.71 in postpetition gap period debt. As for services performed prior to May 1, 1987, the firm claims secured status in two condominium units owned by Hanson estimated at between $15,000 and $20,000 in

---

5. The original request for priority fees was in the sum of $63,859.71, but Lindquist & Vennum has revised its claim to exclude 6.25 hours at $180.00 per hour, or $1,125.00, which are entries relative to litigation on behalf of the debtor

with respect to FSP, which Lindquist & Vennum asserts is the subject of another claim. That deduction likewise reduced the overall claim from $87,253.81 to $86,128.81.

value. It claims that the time and expense rendered and incurred between May 1, 1987, and July 23, 1987, is entitled to second priority status under section 507(a)(2) because these costs and attorneys fees were incurred by the debtor in the ordinary course of business during the involuntary gap period under 11 U.S.C. § 502(f). The firm has requested that the court limit its decision at this time to determining the question of whether the gap period time and expense is entitled to secured priority status or rather must be treated as an unsecured claim, leaving for later resolution the question of the amount of the prepetition secured claim. The Bank and two unsecured creditors, Phillips Petroleum and Walter Dunn, have objected to the allowance of priority status under 11 U.S.C. § 502(f).[6]

■ The Bankruptcy Code protects administrative expenses incurred during the course of bankruptcy proceedings by a grant of first priority status in the distribution of the estate. 11 U.S.C. §§ 503 and 507(a)(1). Section 503, however, specifically excepts involuntary gap creditors from this first priority status. Under 11 U.S.C. § 303(f) until the entry of the order for relief the debtor is entitled to continue its business "as if the involuntary case had not been commenced." *Id.* Section 502(f) further provides that claims arising "in the ordinary course of debtor's business and financial affairs" following the filing of the involuntary petition but prior to the entry of an order for relief are treated as gap claims which receive second priority status under section 507(a)(2). Payment of these involuntary gap creditors is made prior to all claimants except administrative expense claimants. In particular, section 502(f) states:

> In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after commencement of the case but before the earlier of the appointment of a trustee and the order for relief shall be determined as of the date such claim arises, and shall be allowed ... or disallowed ... the same

as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(f). Section 502(f) was intended to protect the creditors who deal with an involuntary debtor during the gap period, such as lessors, trade creditors and similar parties, consistent with section 303(f)'s specific grant to the involuntary debtor to conduct its business in ordinary fashion while its status is resolved. *See* S.Rep. No. 95–989, 95th Cong., 2d Sess. 65, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5851.

In several places, the Bankruptcy Code specifically addresses payment of counsel involved in bankruptcy cases. Sections 327 to 330, for example, cover retention and payment of counsel for the trustee, a trustee authorized to operate a business under 11 U.S.C. §§ 721, 1202 or 1108, and counsel for a creditor's committee. Section 503(b)(4) addresses compensation to counsel for petitioning creditors and others who render substantial benefit to the estate. Section 303(i) now specifically allows a debtor against whom an involuntary petition is filed to recoup its attorneys fees in successfully defending against the filing of an involuntary petition. None of these provisions address the question of how counsel for an unsuccessful debtor against whom an involuntary petition has been filed shall be paid. Lindquist & Vennum's motion to secure payment for services rendered and costs and expenses incurred thus raises the single question of whether fees and expenses incurred by this debtor in the gap period between May 1, 1987 and July 23, 1987 were in the "ordinary course of the debtor's business or financial affairs" under 11 U.S.C. § 502(f). I have found no authority directly on point; none has been cited by the parties. Thus, in deciding this issue I will look to definitions of "ordinary course of business" which have developed for that term as it is used in other Code sections.

"Ordinary course of business" is a term used in 11 U.S.C. § 363(c)(1), which allows a debtor in possession to enter into transactions in the ordinary course of business

---

**6.** The trustee indicated at the hearing that she took no position on this issue.

without court approval; in its counterpart, 11 U.S.C. § 363(b)(1), which requires court approval of the use, sale or lease of the business or property of the debtor outside the ordinary course of business; and in 11 U.S.C. § 547(c)(2)(A), dealing with the ordinary course of business exception with regard to the avoidance of a preferential transfer. In the context of these statutory provisions, the term "ordinary course of business" has developed both a vertical and a horizontal dimension. *See Johnston v. First St. Cos. (In re Waterfront Cos.)*, 56 B.R. 31, 34–35 (Bktcy.D.Minn.1985). Under the vertical test, sometimes referred to as the creditors' expectation test, the court "examines the debtor's transaction from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *In re Johns–Manville Corp.*, 60 B.R. 612, 616 (Bktcy.S.D.N.Y.1986). As Judge Kressel has held, the vertical test can be framed as whether "the transaction is within the day to day business of the debtor without some kind of separate authorization." *Waterfront Cos.*, 56 B.R. at 35. The bankruptcy court in *Johns–Manville* pointed out that "the touchstone of ordinariness is the interested party's reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business". 60 B.R. at 616 (quoting *Armstrong World Indus. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y.1983)). This test necessarily focuses on a comparison between the debtor's pre and postpetition activities to discern significant alterations in its activity. The horizontal or industry wide test concentrates on an industry wide perspective and has also been utilized. *See Waterfront Cos.*, 56 B.R. at 34–35. The horizontal dimension involves comparing the debtor's business to other like businesses and deciding "whether a type of transaction is in the course of that debtor's business or in the course of some other business." *Id.* at 35. The distinction between the two tests, simply stated, is that the vertical test focuses on the internal workings and operations of the debtor while the horizontal test focuses on the external relationship or comparison between this debtor's business and similar businesses. Under either test, an examination of the transaction vis-á-vis the debtor's business or vis-á-vis the industry, the size, nature or both, of the transaction may be dispositive on the issue of ordinariness. What may be ordinary for a large, multinational corporation engaged in a number of businesses is distinctly different from what is ordinary in a smaller corporation with lesser capital, fewer employees and fewer business transactions.

■ In this case, either under a horizontal or vertical test, much of the time for which Lindquist & Vennum seeks second priority status falls outside the ordinary nature of things. Creditors would not ordinarily and reasonably expect a company with virtually no assets and no business to expend more than $60,000.00 over a period of 11 weeks in litigation of any sort. Thus, while some reasonable amount of attorneys fees and costs might be expected to minimally keep certain of the claims of the company alive, sums in amount and of the nature involved, and efforts as zealous and determined as these are not reasonably justified. From the horizontal perspective, it is doubtful that other business entities in like position could justify such an outlay of expense. This is particularly true where there is an alternative cause of action, such as here where debtor could have but failed to voluntarily convert to a chapter 11 or failed to exercise its option to avoid the expense entirely by agreeing to, rather than opposing, the appointment of a trustee.

In another context, that relating to preferential transfers, attorneys fees and expenses have been held to be not in the ordinary course of business of companies with little or no functioning business. In *Kallen v. Litas*, 47 B.R. 977 (N.D.Ill.1985) fees paid to attorneys by a company which was closed down were held not to be in the ordinary course of business. The court stated,

The ordinary course exception contemplates normal credit transactions, such as

the sale of goods for a business supplier on account. The relationship between the debtor and the firm did not arise in the course of such an ordinary trade transaction.

*Litas,* 47 B.R. at 984 (citation and footnote omitted).

Similarly, *In re Peninsula Roofing & Sheet Metal, Inc.,* 9 B.R. 257 (Bktcy.W.D. Mich.1981) held that the ordinary course of business exception does not apply to protect payments to attorneys where the company was closed:

> Debtor had closed its business, it was insolvent and attempting to dissolve; its secured creditor was about to foreclose. Under these circumstances it cannot be said that the payment was made according to ordinary business terms. . . . This was anything but in the ordinary course of business.

*Id.* at 261.

Debtor's citation to *In re Sun Spec Indus.,* 3 B.R. 703 (Bktcy.S.D.N.Y.1980) is inapposite. In *Sun Spec* the debtor chose to voluntarily convert to a chapter 11, an option this debtor rejected. The court in *Sun Spec* was then treating the claim as one for compensation under 11 U.S.C. § 330. The reference in the case to counsel's possibly being a claimant under section 502(f) was dictum.

Closer on point is the case of *In re J.V. Knitting Serv. Inc.,* 22 B.R. 543 (Bktcy.S. D.Fla.1982) where the bankruptcy court denied an application for fees of counsel for the debtor who had opposed an involuntary petition and counterclaimed for damages. When these efforts were unavailing and an order for relief was entered, the case was converted to one under chapter 11 and subsequently reconverted to one under chapter 7. Thus, the case was also decided in the context of section 330 of the Bankruptcy Code. However, the language contained therein is helpful.

> A debtor's attorney is accorded an administrative priority for compensation upon the premise that its services, to some extent at least, have benefited the administration of the estate. Generally, the debtor's counsel brings the case into court, prepares the necessary schedules and assists the debtor in reporting its assets and liabilities for administration. However, in this instance the debtor's counsel did not perform any of these essential administrative functions. Instead, as it turns out, he seriously delayed and impeded the administration of the case in a completely unsuccessful effort to effect a major recovery of damages from a principal creditor, Lemon Twist.
>
> I am convinced that Mr. Kahn, a capable and experienced attorney, acted in complete good faith and I find nothing sinister or unethical in the positions which he asserted in this case. However, I conclude that his services were provided by him on a contingent basis. He neither sought nor obtained any payment in advance. Had he been successful, his efforts would have substantially benefited the debtor and the creditors. His compensation would have been substantial. However, since his efforts in this instance proved completely unsuccessful and, in fact, obstructed and impeded the administration of the case, he is not entitled to administrative compensation from this estate either for his services or his expenses incurred in these efforts.

*J.V. Knitting,* 22 B.R. at 545 (citations omitted).

*In re Kenval Marketing Corp.,* 84 B.R. 32 (Bktcy.E.D.Pa.1988) is also somewhat helpful though decided in a somewhat different context. In *Kenval* the bankruptcy court denied compensation to a law firm for the assignee under a state assignment for benefit of creditors in opposing the involuntary petition. Even though the assignee's efforts were taken in complete good faith and in the belief that the involuntary bankruptcy would be less beneficial to the creditors than continued proceedings under an assignment for the benefit of creditors, the court held that counsel to the assignee could only be compensated for services rendered which benefitted the estate. *Kenval,* 84 B.R. at 33.

A review of the timesheets submitted by Lindquist & Vennum in connection with its

claim demonstrates that only a small fraction of the fees and costs for which compensation is sought would appropriately be considered within the ordinary course of business of a debtor in the financial condition debtor found itself in 1987. This work, in general, included reasonable amounts of attorneys fees and costs incurred in connection with matters of a general corporate nature and, to a limited extent, the continued financing of corporate litigation which was ongoing at the time the petition was filed. Therefore, I will allow $12,394.52 of the total amount said to be compensable on a second priority basis. This figure is made up of fees and expenses incurred in connection with general corporate matters and continued, but restricted, pursuit or defense of litigation from which the debtor could not and did not exclude itself at the date of the filing of the petition.[7]

In reaching this conclusion, I have considered policy arguments advanced by both sides on this issue. Lindquist & Vennum has argued that second priority status should be granted to the fees and expenses incurred in connection with defending the filing of an involuntary petition in bankruptcy because to do otherwise cripples a debtor who ought to defend, as for example where a filing truly is in bad faith. It urges the inequities of paying counsel for the successful petitioning creditors on a first priority basis, while denying payment, except on an unsecured basis, to counsel for the unsuccessful debtor. Where, as here, counsel unsuccessfully advanced arguments in good faith, Lindquist & Vennum asserts that it is unfair and unjust to fail to allow it payment on a priority basis. The Bank and the other creditors urge that there is no inequity under the circumstances. If the defense has merit, they urge, the debtor will either be able to provide a substantial retainer, which is a protected postpetition transfer under 11 U.S.C. § 549(b), or counsel will be willing to take on the defense on a contingency basis. They also urge that Lindquist & Vennum's proposed construction of 11 U.S.C. § 502(f) promotes unnecessary and wasteful litigation because it encourages counsel to take on defenses which in any other context would not be pursued. It also leads to the anamolous result that if a debtor loses the defense of an involuntary petition, its counsel's fees will receive second priority status and a fair chance of payment; if the debtor wins, then debtor cannot pay and the debtor cannot recover damages under 11 U.S.C. § 303(i)(1), and its counsel may not be paid.

I find the arguments made by the Bank compelling. Congress was quite specific in designating certain types of attorneys fees to be recovered under the Code. In the involuntary petition context, Congress specifically provided that under certain circumstances debtors who successfully defend against involuntary petitions should recoup their costs and expenses of defense from the opposing side. *See* 11 U.S.C. § 303(i).

**7.** The fees allowed in this category are as follows:

| Date | Matter | Billed | Allowed |
|------|--------|--------|---------|
| 5/31/87 | Dow Chemical | $ 25.00 | $ 25.00 |
| 5/31/87 | New England Bank loan restructuring | $ 650.72 | $ 650.72 |
| 5/31/87 | Employee litigation | $ 2,259.65 | $ 819.65 |
| 5/31/87 | General corporate | $ 9.60 | $ 9.60 |
| 6/30/87 | Creditor issues | $ 41.84 | $ 41.84 |
| 6/30/87 | New England bank loan restructuring | $12,561.77 | $6,899.27 |
| 11/30/87 | Creditor issues | $ 72.50 | $ 72.50 |
| 11/30/87 | New England Bank loan restructuring | $ 4,575.00 | $3,552.50 |
| 9/30/87 | Creditor issues | $ 33.01 | $ 33.01 |
| 9/30/87 | New England Bank loan restructuring | $ 290.43 | $ 290.43 |

The difference between billed and allowed time above is attributable to exclusion of time which, while listed under these matters, was properly billed to the bankruptcy case.

All other fees and expense in the time sheets submitted by Lindquist & Vennum have been excluded. Specifically, I have not included the Waldun Dunn arbitration (November 30, 1987, matter 010) because it appears this was work

It also specifically addressed the issue of payment of fees and expenses of successful petitioning creditors in 11 U.S.C. § 503(b)(3)(A) and (b)(4). It made no provision for payment of fees and costs for an unsuccessful defense to an involuntary petition, apparently leaving that to be resolved in the legal marketplace. Meritorious defenses will be funded either by a debtor able to advance a retainer (which this debtor would not or could not provide) or will be taken on a contingency fee basis with the expectation of a recovery, in the first instance, from the opposing side under 11 U.S.C. § 303(i). In this case, except for legal fees incurred on a limited basis in the ordinary course of business which I have determined to allow, I believe Lindquist & Vennum, like debtor's counsel in *J.V. Knitting*, took the risk that its claim might be reduced to unsecured status if the defense was unsuccessful.

I emphasize that I in no way intend this decision to impugn the integrity or quality of the work performed by Lindquist & Vennum. Given the obvious goal of their client to pursue a defense at all cost, their work was of high quality and performed by able lawyers.[8] The only issue I have addressed is whether this court can or should construe the applicable Code provisions to place Lindquist & Vennum's claim above the other unsecured creditors; I have concluded that, given the statutory framework in which we work, I should not.

For the reasons set forth above,

IT IS HEREBY ORDERED that:

1. The Bank's application for an administrative expense claim is allowed in the sum of $40,000.00, but is otherwise denied. Pursuant to the settlement agreement between the trustee and the Bank approved by this court the Bank shall make no other claim for legal fees and costs and expenses incurred in connection with the involuntary petition in this case.

2. The Heitzig plaintiffs' application for an administrative expense claim is allowed in the amount of $6,807.89, but is otherwise disallowed.

3. Claim No. 108 filed by Lindquist & Vennum for fees and expenses incurred during the involuntary gap period is an ordinary business expense under 11 U.S.C. § 502(f) entitled to second priority status under 11 U.S.C. § 507(a)(2) to the extent of $12,394.52 but is otherwise unsecured. I have not resolved any portion of the claim which seeks compensation for time and expenses incurred prior to May 1, 1987.

---

not performed on debtor's behalf. I have also excluded all time related to matter 021, the bankruptcy issue.

8. Advising a debtor faced with an involuntary petition has been described as "a delicate operation." *Cowan's Bankruptcy Law & Practice*, § 14.2 (1983 interim ed.). "Many persons served with an involuntary petition will almost automatically assume that it must be resisted. Those who regard it as a great moral challenge, an impuning [sic] of honor and integrity, as an impermissible insult will not be dissuaded." *Id.* Steven Hanson quite clearly reacted in this fashion to the petition. His unsecured creditors should not suffer by reason of this attitude.