**In the Matter of OHIO FERRO–AL-LOYS CORPORATION, Debtor.**

**Bankruptcy No. 686–01395.**

United States Bankruptcy Court, N.D. Ohio.

Feb. 15, 1989.

Daniel R. Swetnam, of Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio for applicant, Bank One, Columbus NA.

Lawrence E. Oscar, Hahn Loeser & Parks, Cleveland, Ohio, for debtor.

Alan R. Lepene, and Glenn R. Schmitt, of Thompson, Hine & Flory, Cleveland, Ohio, for Unsecured Creditors Committee.

## MEMORANDUM OF DECISION RE: PAYMENT OF ADMINISTRATIVE EXPENSES

JAMES H. WILLIAMS, Chief Judge.

Pending is an Application for Immediate Payment of Administrative Expenses of Bank One, Columbus NA (Bank One). Specifically at issue are the charges for professional services rendered and expenses incurred by Bank One's legal counsel, Schwartz, Kelm, Warren & Rubenstein (Schwartz, Kelm).

### FACTUAL BACKGROUND

Ohio Ferro Alloys Corporation (OFAC), a debtor before this court under Chapter 11 of Title 11 of the United States Code, in the summer of 1987, approached Bank One about a permanent financing arrangement which would supplant the debtor's existing relationship with Fidelcor Business Credit Corporation (Fidelcor) as the debtor's working capital lender. Negotiations ensued and Bank One issued a commitment letter on September 24, 1987. The letter was accepted by OFAC and obligated OFAC to pay "[a]ll out-of-pocket legal and other expenses of BANK ONE." (Exhibit 1) On May 26, 1988, a 73–page Loan and Security Agreement (Agreement) between OFAC and Bank One was signed. One of the provisions of the Agreement reads as follows:

> *EXPENSES.* All fees, costs or expenses, including reasonable fees and expenses of outside legal counsel, incurred by the Bank in connection with either the preparation, administration, amendment, modification or enforcement of the Loan Documents ... (including, without limitation, (a) all expenses ...) shall be paid by the Borrower, on demand, except to the extent the payment of any portion of such amounts is specifically prohibited by an order of the Court in Bankruptcy Proceeding; ...

*Section 12.6 Loan and Security Agreement.* (Exhibit 2)

The loan Agreement was orally approved by this court at a hearing duly convened upon notice on July 22, 1988. However, on July 28, 1988, before any order on the July

22nd hearing was entered, OFAC notified Bank One that it had decided to enter into a new loan with Fidelcor and, on August 8, 1988, withdrew its motion for authority to borrow from Bank One.

OFAC made its decision to remain with Fidelcor as its lender because of more favorable terms advanced by Fidelcor, both in comparison to the original agreement between Fidelcor and OFAC and the terms offered by Bank One. Bank One maintains that its offer had the effect of driving down the cost of Fidelcor's terms with the result that the estate was benefited. Therefore, says Bank One, its efforts bring it within the ambit of 11 U.S.C. § 503 which provides, in relevant portions:

\* \* \* \* \* \*

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case:

\* \* \* \* \* \*

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

\* \* \* \* \* \*

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title; or

\* \* \* \* \* \*

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimburse-ment for actual, necessary expenses incurred by such attorney or accountant;

\* \* \* \* \* \*

Bank One seeks $35,893.70 for Schwartz, Kelm's services and $1,415.48 in reimbursement of expenses incurred by the law firm.

OFAC, in its response to Bank One's application, generally agrees that Bank One's offer to lend was a "significant" factor in obtaining more favorable terms from Fidelcor and that the legal fees and expenses incurred by Bank One in the process were "necessary and reasonable." It insists, however, that the application should be reduced by $15,000.00, pursuant to the terms of a certain letter agreement dated May 26, 1988 which provides in relevant part:

(1) Notwithstanding Section 12.6 of the Agreement, the Borrower [OFAC] will not be liable for the initial $15,000.00 of legal fees and related expenses of the Bank ...; (Exhibit 3)

The official Unsecured Creditors Committee (Committee) is opposed to Bank One's application. It points out that because the borrowing from Bank One was never approved by the court and could not have otherwise become binding, the debtor had no contractual obligation to Bank One. It further notes that Section 503(b)(3) and (4) is of no avail to Bank One for it is not seeking reimbursement of its expenses as a creditor of OFAC. Finally, the Committee urges that Bank One is not entitled to relief under Section 503(b)(1)(A) because its expenses were neither necessary nor preservative of the debtor's estate. In short, argues the Committee, Bank One took a risk when it ventured into negotiations with OFAC and it cannot pass off to the debtor's estate the costs attributable to its efforts.

## DISCUSSION

Bankruptcy Judge White of this District accurately traces the roots of a debtor in possession's authority in *In re Deluca Distributing Company*, 38 B.R. 588 (Bankr.N.D.Ohio 1984):

By filing its Chapter 11 petition the debtor automatically became a debtor in

possession under 11 U.S.C. section 1101. As a debtor in possession, the debtor, for the most part, stands in the shoes of the trustee. The court has the authority to limit or condition the rights and powers of a debtor in possession. 11 U.S.C. section 1107(a). In the present proceedings, though, the court has not acted to limit the authority of the debtor. Thus, upon the filing of the Chapter 11 petition, the debtor, as a debtor in possession, had all the rights and powers of a Chapter 11 trustee.

A Chapter 11 trustee is authorized, pursuant to 11 U.S.C. section 1108, to operate the debtor's business. The trustee is not required to obtain a court order to operate the debtor's business. Indeed, under section 1108 the court may exercise only the negative power of prohibiting the trustee from operating the debtor's business.

The authority to operate the debtor's business necessarily includes the concomitant discretion to exercise reasonable judgment in ordinary business matters. The discretion to act with regard to ordinary business matters without prior court approval is at the heart of the trustee's powers. The statutory source for the trustee's authority in this matter is found at 11 U.S.C. section 363(c)(1), which provides:

> If the business of the debtor is authorized to be operated under section 721, 1108, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

Since the debtor is a debtor in possession, section 363 applies equally to it. * * * (Footnotes an citations omitted)

*Deluca* at 591.

## FINDINGS

### A.

This court is of the opinion that OFAC, in the exercise of its authority as a debtor in possession and under no restrictive orders by the court, was functioning in the ordinary course of its business when it entered into the September 24, 1987 commitment with Bank One to pay the latter's legal fees in connection with the loan the debtor was seeking. The debtor's restructuring of its working capital loan was critical to its efforts to reorganize. It had a relationship with Bank One from an earlier letter of credit transaction and through the services of an affiliate of Bank One as the indenture trustee for certain bonds issued by OFAC.

One of the conditions imposed by Bank One for going forward with a new financing arrangement was the debtor's agreement to pay Bank One's legal fees and expenses in putting together the loan package. The only testimony presented to the court was to the effect that such "transactional" costs, as Bank One's witness characterized Schwartz, Kelm's fees, are customarily passed on to the borrower.

It is obvious that significant borrowing had for sometime been a regular part of OFAC's business. As the District court in *In re James A. Phillips, Inc.*, 29 B.R. 391 (S.D.N.Y.1983) said:

> The touchstone of "ordinariness" is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing, because their objections to such transactions are likely to relate to the bankruptcy's chapter 11 status, not the particular transactions themselves. Where the debtor in possession is merely exercising the privileges of its chapter 11 status, which include the right to operate the bankrupt business, there is no general right to notice and hearing concerning particular transactions. To preclude such transactions, interested parties must apply to the Bankruptcy Court for relief from the stay, 11 U.S.C. § 362(d)(1), or for conver-

798

sion or dismissal of the chapter 11 petition, 11 U.S.C. § 1112(b).

*Phillips* at 394.

*In re Waterfront Companies, Inc.*, 56 B.R. 31 (Bankr.D.Minn.1985) involved the consideration of whether a Chapter 11 debtor's entry into an indemnity agreement was such a transaction as is authorized by 11 U.S.C. § 363(c)(1) as "in the ordinary course of business." While the court's analysis led it to conclude that the indemnity agreement was not something the debtor in possession may agree to without notice to its creditors, it cited with approval the language from *Phillips* quoted above as well as the *Phillips* court's observation that " 'the apparent purpose of requiring notice only where the use of property is extraordinary is to assure interested persons an opportunity to be heard concerning transactions different from those that might be expected to take place so long as the debtor in possession is allowed to continue normal business operations under 11 U.S.C. § 1107(a) & § 1108.' " *In re Waterfront Companies, Inc.*, at 35, quoting *Phillips* at 394.

The question becomes, would agreeing to pay legal fees attendant upon a loan application be an expenditure of OFAC which its creditors could reasonably demand the right to be heard? The court in *Waterfront* concluded, correctly it would seem, that an agreement to indemnify against losses which totaled in the millions of dollars was indeed something about creditors of a Chapter 11 debtor ought to be consulted and since they were not, the agreement under examination in that case was void. OFAC exposed its estate to no such liability and it should not be held to have acted outside the ordinary course of its business in agreeing to pay Bank One's legal costs and expenses.

Creditors, and certainly this court, must be concerned about any interpretation of the holding here as authority for unfettered spending by debtors in possession for what might be frivolous purposes. Of course, the court intends no such effect. The circumstances of each case must be examined and weighed. *See, In re Hanson*

*Industries, Inc.*, 90 B.R. 405 (Bankr.D. Minn.1988). Fortunately, OFAC's engagement of Bank One as a prospective lender proved fortuitous as leverage to obtain better terms from the original working capital lender, Fidelcor. The loan arrangement ultimately approved will result in a savings to the debtor of between its estimate of $50,000.00 and the $250,000.00 Bank One says the debtor will save, a situation which, the debtor admits, and the evidence certainly does not refute, came about because Bank One's proposal was a "significant" factor in the negotiations with Fidelcor.

It is unnecessary to consider the Committee's objection concerning Bank One's status as a creditor, if indeed it is, and hence the applicability of Section 503(b)(3) and (4) for, in the court's view, Bank One's role had the effect of preserving the debtor's estate and, accordingly, payment may be authorized under Section 503(b)(1)(A).

**B.**

▆ The court turns next to the determination of the appropriate amount due sought by Schwartz, Kelm for its efforts.

*1.*

First, the debtor raises the issue of a $15,000.00 credit against the legal fees and expenses provided for in the May 26, 1988 letter agreement and insists that Bank One is entitled to no more than $22,309.18 of the total of $35,893.70 it seeks to recover. While arguing that OFAC's decision to be responsible for the costs of Bank One's legal services and expenses in connection with the loan it sought is an ordinary course of business expense and severable from the requirement that the overall loan transaction be approved by the court after notice to creditors, Bank One urges that the May 26, 1988 letter agreement is of no force and effect since the loan was never consummated. The court disagrees. The language used is unequivocal. (See p. 796 *supra.*) Bank One cannot have it both ways; if the September 24, 1987 Agreement binds the debtor to pay the fees and expenses, the bank's unconditional proposal

the following May to reduce them is equally effective.

### 2.

The court is asked to approve an expenditure which will, to the extent allowed, reduce the debtor's estate. Therefore it is clearly within the court's authority to review the reasonableness of the request. *See, In re B–K of Kansas, Inc.,* 82 B.R. 135 (Bankr.Kansas 1988); *In re Laurinburg Oil Company, Inc.,* 49 B.R. 652 (Bankr.M.D.N.C.1984); *In re Hearth & Hinge, Inc.,* 28 B.R. 595 (Bankr.S.D.Ohio 1983).

The court is struck by several factors. First, there appears to be an overabundance of lawyer conference time spent in preparing for and delivering the ultimate loan documents. Granted, the finished product is a lengthy, sophisticated collection of instruments, undoubtedly protective of the bank's interests from every conceivable angle. Nevertheless, the facts and circumstances surrounding OFAC and the loan it sought hardly appear to be matters of first impression requiring the hours of research and consultation that seem to have been invested by Schwartz, Kelm. For example, on December 14, 1987, a conference involved James Ryan, Jeffrey Ritter, D.J. Whaley and D.R. Swetnam, all partners or associates of Schwartz, Kelm, the total charges for which, at the rates of the individuals involved, amounted to $473.50.

Second, Mr. Ryan, on that same date, did more than simply confer with his colleagues; he asserts a charge for reviewing "Chapter 11 and its effect on labor contracts", an effort of seeming irrelevance to this loan transaction. Through the balance of December, 1987, several conferences between Messrs. Ritter, Whaley and Ryan took place for which, of course, each asserted charges. Multiple attorney charges occur on nine separate dates in January and at least twice in most of the months following through July, 1988. M.A. Ahlmer is noted to have performed 2.3 hours in connection with the "Texaco bankruptcy" at an hourly charge of $45.00, or a total of $103.50. M.H. Little, on July 21, 1988, asserted the following charge: "Analyze In re McKeesport Steel Castings Co. re: utility expenses." At an hourly rate of $50.00, a total of $60.00 was entered in the charges against the OFAC loan.

The court has not the time to invest in a further analysis of the awkward listing of each individual's time supposedly devoted to this project which, rather than being presented in chronological order, is shown by month for each professional who levied charges for that month.

Finally, Bank One urges this court to review its previously announced position relative to the non-compensability of time spent in seeking payment from a debtor's estate for professional services rendered. *See, In re Mansfield Tire and Rubber Company,* 65 B.R. 446, 458 (Bankr.N.D. Ohio 1986) and the cases cited therein. Bank One points out that subsequent to this court's ruling in *Mansfield Tire,* the Sixth Circuit has addressed the issue in *Coulter v. State of Tennessee,* 805 F.2d 146, (6th Cir.1986), *cert. den.* 482 U.S. 914, 107 S.Ct. 3186, 96 L.Ed.2d 674 (1987).

*Coulter* involved a separate petition by counsel for obtaining relief for his client under Title VII of the United States Code. Judge Merritt discussed the matter as follows:

*Preparation of Fee Application.*—Although time spent in preparing, presenting, and trying attorney fee applications is compensable; [sic] some guidelines and limitations must be placed on the size of these fees. Otherwise the prospect of large fees later on may discourage early settlement of cases by rewarding protracted litigation of both the civil rights case and the attorney fee case. [4] The cases from this and other circuits uniformly hold that a lawyer should receive a fee for preparing and successfully litigating the attorney fee case after the original case is over, although in the private market place, lawyers do not usually charge, and clients do not usually pay, for the time it takes lawyers to calculate their fees. *See* cases collected and discussed in *In re Nucorp Energy,*

*Inc.,* 764 F.2d 655, 660 (9th Cir.1985). The legislative intent behind attorney fee statutes, however, was to encourage lawyers to bring successful civil rights cases, not successful attorney fee cases. The attorney fee case is not the case Congress expressed its intent to encourage; and in order to be included, it must ride piggyback on the civil rights case. *Coulter* at 151.

This court is of the view that a case in bankruptcy is much closer to the situation in the "private market place" than is the quest of one who seeks redress for deprivation of his or her rights. To analyze further, the purpose of awarding compensation for professional services out of bankruptcy estate funds is to avoid requiring the professional to fund the liquidation or reorganization from his or her own resources, for very often there is no other source of compensation. That same pool of assets cannot equitably be used, in this court's view, to reimburse a professional for urging his reimbursement and this court does not regard the rationale of *Coulter* as requiring a different conclusion.

The difference between a "fund-in-court" case, to which a bankruptcy case may be likened, and a statutory fee case such as *Coulter* is explained well in *In re Shaffer–Gordon Associates, Inc.,* 68 B.R. 344 (Bankr.E.D.Pa.1986) where the court said, at pages 349–50:

> Logically, we also cannot detect any substantial distinction between the fund created in our court in a bankruptcy case and other fund-in-court cases. Most bankruptcies are brought about by a fiscal crisis experienced by a debtor. In a typical Chapter 11 case, the debtor is insolvent and a plan which impairs the rights of one or more classes of creditors is prepared. Any amounts paid to counsel will usually result in a reduction in a distribution to creditors. The interests of innocent creditors may be sacrificed if funds are distributed to counsel for a fee. Many of these creditors express indignation when they learn that their claims are subordinate in time, amount, or both to attorneys, who entered into

their contract of representation with their eyes open as to a debtor's fiscal problems. Meanwhile, in a statutory-fee case, a "guilty" wrongdoer must pay the counsel fees, and no innocent party can possibly be prejudiced by the award of fees to counsel. It therefore seems to us that a bankruptcy case is very much like a fund-in-court case, and bears little or no resemblance to a statutory-fee case.

## CONCLUSION

The court will reduce the total application before it for fees and expenses of $37,309.18 by the following amounts: $15,000.00 pursuant to the agreement of May 26, 1988; $3,009.50 in fees asserted in connection with the presentation of the instant application; $4,299.68 for what the court considers to be excessive, duplicative and misplaced charges for work by a variety of members, associates and employees of Schwartz, Kelm. An order allowing Bank One's application in the resulting amount of $15,000.00 shall issue.