**In re SGS STUDIO, INC., Debtor.**

**No. 00–33766–SAF–7.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Nov. 14, 2000.

Deidre B. Ruckman, Gardere & Wynne, L.L.P., Dallas, TX, for Capital Factors, Inc.

H. Jefferson LeForce, Patton Boggs LLP, Dallas, TX, for CIT Group/Commercial Services, Inc.

Daniel J. Sherman, Sherman & Yaquinto, L.L.P., Dallas, TX, Chapter 7 Trustee.

### MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Bankruptcy Judge.

Capital Factors, Inc., moves the court for the payment as an administrative expense of certain costs and expenses incurred in its efforts to provide post-petition financing to SGS Studio, Inc., the debtor. The CIT Group/Commercial Services, Inc. ("CIT") objects to Capital Factor's motion. The court held an evidentiary hearing on the motion on October 30, 2000.

The allowance of an administrative expense constitutes a core matter over which this court has jurisdiction to enter a final order. 28 U.S.C. §§ 157(b)(2)(A) and (O) and 1334. This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rules 7052 and 9014.

SGS Studio filed its petition for relief under Chapter 11 of the Bankruptcy Code on June 7, 2000. CIT had been SGS' pre-petition lender. Although it terminated the pre-petition lending facility, CIT offered SGS post-petition financing but SGS did not respond to CIT's offer. Apparently unhappy with CIT, SGS approached Capital Factors and, on June 28, 2000, secured Capital Factors' commitment to provide post-petition financing.

The vice-president of Capital Factors testified that he knew of CIT's offer when he made the commitment. The June 28 agreement between Capital Factors and SGS provided that SGS would pay for Capital Factors' attorney's fees and costs. SGS paid Capital Factors $10,000 to be applied towards fees and expenses, which total $20,000.

Capital Factors requests payment of the $10,000 as an administrative expense. Although it incurred over $20,000 in attorney's fees and related expenses in its attempt to provide post-petition financing to the debtor, Capital Factors only seeks to retain the $10,000 which it received from SGS.

The Bankruptcy Code provides that "an entity may timely file a request for payment of an administrative expense[.]" 11 U.S.C. § 503(a). Section 503(b) provides:

> After notice and a hearing, there shall be allowed administrative expenses . . . including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate[.]

Capital Factors bears the burden of proving that its claim is for "actual, necessary costs and expenses of preserving the estate." *In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir.1992). The words "actual" and "necessary" are to be construed narrowly. "[T]he debt must benefit [the] estate and its creditors." *NL Industries, Inc. v. GHR Energy Corp.*, 940 F.2d 957, 966 (5th Cir.1991)

> A prima facie case under § 503(b)(1) may be established by evidence that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function as a going concern. After the movant has established a prima facie case, the burden of producing evidence shifts to the objector; but the burden of persuasion, by a preponderance of the evidence, remains with the movant.

*TransAmerican*, 978 F.2d at 1416. Capital Factors has established that its request arises from a transaction with the debtor in possession. Capital Factors must then show, by a preponderance of the evidence, that the services it supplied, *i.e.* offering post-petition financing, enhanced SGS Studio's ability to function as a going concern.

On June 30, 2000, SGS filed an emergency motion for approval of post-petition financing, seeking approval of the proposed financing by Capital Factors. CIT objected to certain terms of the proposed financing, including the granting of a senior lien, pursuant to 11 U.S.C. § 364(d), on property in which CIT claimed a security interest. To counter the Capital Factors financing, CIT offered to provide interim post-petition financing.

On July 7, 2000, this court held that the debtor could enter into a post-petition financing arrangement with either Capital Factors or CIT. However, if SGS obtained post-petition financing from Capital Factors, Capital Factors would not be granted a senior lien pursuant to 11 U.S.C. § 364(d) because of the availability of CIT financing. 11 U.S.C. § 364(d)(1)(A). SGS obtained interim financing from CIT.

On July 24, 2000, the court held a hearing on SGS' motion for approval of a second interim post-petition financing order. Capital Factors would not waive or withdraw its request for a senior lien under § 364(d). CIT offered continued financing. Since the court could not authorize SGS to obtain financing from Capital Factors under § 364(d)(1)(A), SGS pursued financing from CIT.

Capital Factors contends that its presence as a willing, ready and able post-petition lender compelled CIT to improve the terms of its post-petition loan offer to SGS, thereby providing a benefit to the estate and supporting the allowance of an administrative expense. Capital Factors

incurred actual expenses for negotiating the loan package, for drafting the loan documents and for preparing the motion under § 364. Capital Factors contends that but for this effort, CIT would not have improved its loan terms.

Capital Factors has not presented evidence quantifying the perceived benefit to the estate. CIT concedes that it modified the terms of the loan to match the terms of the Capital Factors proposal, but contends that the modifications provided no actual benefit to the estate. CIT contends that rather than turn to Capital Factors, SGS could have responded to the CIT offer and negotiated the terms of a post-petition loan with CIT without incurring the Capital Factors expenses.

Capital Factors offered to guarantee SGS' obligations to its vendors up to $1,000,000. CIT's June offer only guaranteed up to $750,000. CIT later matched Capital Factors' offer. Capital Factors offered SGS an advance rate of 50 percent of domestic inventory, up to $1,000,000. CIT's June offer advanced up to $275,000 on inventory. CIT later matched Capital Factors' offer. Lastly, after the July 24 hearing, CIT negotiated events of default which were more favorable to SGS. Based on these changes by CIT, Capital Factors argues that the estate received a benefit from the lender competition. A benefit in the terms of a post-petition loan would tend to advance a debtor's ability to remain in business.

Gary P. Vessecchia, CIT's vice president, testified that CIT submitted its post-petition financing offer to SGS before SGS consulted with Capital Factors. Capital Factors acknowledges that it knew about the CIT offer before it incurred any expenses. SGS did not respond to the CIT offer and did not negotiate with CIT. Vessecchia further testified that CIT's vendor guaranty limit and inventory advance limit had been proposed based on CIT's analysis of SGS' historic performances and likely projections from the historic performances. CIT concluded that its initial of-

fer would be more than adequate to provide for SGS' realistic post-petition needs. After the initial hearing on interim financing, CIT decided to match the Capital Factors term limits to eliminate any controversy. Vessecchia testified that the change provided no benefit to SGS because SGS had no reasonable likelihood of reaching those vendor and inventory limits.

Capital Factors offered no evidence to rebut that testimony. Capital Factors did not offer evidence from SGS about the vendor and inventory advance limits or about any SGS business plan. Capital Factors offered no evidence to support how CIT's event of default changes benefitted the SGS operations.

CIT had a pre-petition relation with SGS. Under that lending relationship, CIT had access to SGS' financial and business records. That familiarity lends weight to CIT's unrefuted testimony that matching the Capital Factor terms provided no measurable benefit to SGS. Based on this record, Capital Factors has not met its burden of proving that SGS had an enhanced ability to function as a going concern because of the changes to the CIT loan terms resulting from the Capital Factors' competition. The record does not support a finding that the debtor could better remain in business with the revised CIT loan terms than with the June CIT offer. Capital Factors has therefore failed to establish that the bankruptcy estate and its creditors benefitted from Capital Factors incurring $10,000 to pursue a lending opportunity with the debtor.

A lender's costs of unsuccessfully soliciting business from a debtor does not translate into an administrative expense to be borne by the creditors of a bankruptcy estate without an actual, tangible benefit to the estate and the debtor's ability to function as a going concern.

CIT contends that Capital Factors has not made a "substantial contribution" to the bankruptcy estate. That standard applies to administrative expenses under 11 U.S.C. § 503(b)(3)(D). Capital Factors,

however, seeks administrative expenses under § 503(b)(1)(A). Accordingly, the court considers the case law under § 503(b)(3)(D) for purposes of analogy. The Fifth Circuit has recognized that a creditor may make a "substantial contribution" to a bankruptcy estate by proposing a plan of reorganization that gives creditors a greater distribution on their claims than did the debtor's proposed plan. Notwithstanding the creditor's self-interest in bringing about a greater distribution, the creditor may recover actual and necessary expenses incurred in making a substantial contribution to the case. *See, Matter of DP Partners Ltd. Partnership,* 106 F.3d 667, 673 (5th Cir.1997). *See also, In re Milo Butterfinger's, Inc.,* 218 B.R. 856, 858–59 (Bankr.N.D.Tex.1997) (purchaser of unsecured claim entitled to administrative expense for filing a plan of reorganization which led the debtor to move to dismiss the case by paying non-insiders in full in cash rather than make payments over time under the plan debtor had proposed). These cases demonstrate that if competition increases the value that creditors realize then the party responsible for fostering the competition may be entitled to compensation. However, both *Matter of DP Partners* and *In re Milo Butterfinger's, Inc.* address the meaning of "substantial contribution" under 11 U.S.C. § 503(b)(3)(D).[1] The policy underlying § 503(b)(3)(D) is "to promote meaningful creditor participation in the reorganization process." *DP Partners,* 106 F.3d at 672. By analogy, Capital Factors competition for post-petition lending would have to produce tangible economic benefits enhancing SGS' ability to function as a going concern. Capital Factors has not established tangible economic benefits.

Capital Factors directs the court's attention to *In Matter of Ohio Ferro–Alloys*

*Corp.,* 96 B.R. 795 (Bankr.N.D.Ohio 1989). In *Ohio Ferro–Alloys,* the debtor accepted a commitment letter from Bank One, had the agreement approved by the bankruptcy court, then decided to enter into a new loan with Fidelcor, its pre-petition lender, and withdrew its motion to borrow from Bank One. The court rejected the argument proffered by the creditor's committee that "Bank One took a risk when it ventured into negotiations with [the debtor] and it cannot pass off to the debtor's estate the costs attributable to its efforts." *Id.* at 796. The court granted Bank One's application for administrative expense, but reduced the amount requested.

That case must be distinguished. First, the case does not indicate that the pre-petition lender offered to extend post-petition financing to the debtor whereas CIT offered SGS post-petition financing. Therefore, the debtor in *Ohio Ferro–Alloys* had been in a more dire financial predicament than SGS, which had the option of obtaining interim financing from its pre-petition lender. Second, the court found that "[t]he debtor's restructuring of its working capital loan was critical to its efforts to reorganize [because it] had a relationship with Bank One from an earlier letter of credit transaction and through the services of an affiliate of Bank One as the indenture trustee for certain bonds issued by [the debtor]." *Id.* at 797. In this case, Capital Factors and SGS did not have a pre-existing relationship whose preservation was critical to the debtor's reorganization. Third, the court in *Ohio Ferro–Alloys* found that the loan arrangement which the debtor accepted would save the debtor somewhere between $50,000 (debtor's estimate of savings) and $250,000 (Bank One's estimate of savings). In this case, Capital Factors has not established

---

1. Section 503(b)(3)(D) provides:

   (b) After notice and a hearing, there shall be allowed administrative expenses ... including—
      (3) the actual, necessary expenses ... incurred by—

   (D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title[.]

that CIT's July loan terms, although facially more favorable to SGS than was its initial offer, provided actual tangible benefits to SGS.

Capital Factors could have obtained the debtor's business had Capital Factors withdrawn or waived its requirement for a lien senior to the CIT lien. Had Capital Factors done so, the estate would have paid its reasonable fees and costs. Capital Factors chose not to make that concession. The court does not inquire into Capital Factors' business decision. The court finds, however, that Capital Factors has failed to meet its burden of proving that it provided a benefit to the estate.

Based on the foregoing,

**IT IS ORDERED** that the motion of Capital Factors, Inc., for the allowance of an administrative expense is **DENIED**.