### In re ON TOUR, LLC, Debtor.

### No. 01–13030–PM.

United States Bankruptcy Court, D. Maryland.

April 18, 2002.

Alan M. Grochal, Tydings & Rosenberg, Baltimore, Md., for Fayez Saroim Partnership No. 5 LP.

Brian E. Barkley, Barkley & Kennedy, Chartered, Rockville, Md., for debtor.

James A. Vidmar, Jr., Linowes and Blocher, LLP, Silver Spring, Md., for Eight Petitioning Creditors.

Michael L. Bernstein, Arnold & Porter, Washington, DC, for Super Entertainment Group.

Michael G. Rinn, Cockeysville, Md., for Chapter 11 Trustee.

### MEMORANDUM OF DECISION

PAUL MANNES, Bankruptcy Judge.

The creditors who filed the involuntary petition that initiated this case under chap-

ter 7 ("Petitioning Creditors"[1]) filed the present Application for compensation pursuant to 11 U.S.C. §§ 303, 330, and 503 of the Bankruptcy Code seeking allowance of an administrative priority claim of $53,866.47 for legal services performed by Linowes and Blocher, LLP ("L & B") for the period March 1, 2001, through July 31, 2001. There are three time segments for which compensation is sought: (1) a period from before the petition date until the entry of the Order for Relief; (2) a period from the entry of the Order for Relief under chapter 7 of the Bankruptcy Code until the conversion of the case to a case under chapter 11 (the "Gap Period"); and (3) a period after conversion. The request for an administrative priority claim for the Gap Period is a novel issue for this court. Upon consideration of the entire record, the court finds that the Petitioning Creditors are entitled to compensation for each of the three periods.

## BACKGROUND

While the filing of the involuntary petition against On Tour, LLC was a highly publicized event, much concerning the entity was not. Notwithstanding the lack of disclosure by the debtor, the Petitioning Creditors provided enough information through pleadings and exhibits to enable the court to unravel some of the mystery surrounding this case.

The debtor, On Tour, LLC, otherwise known as the NFL Experience On Tour, was created in the Spring of 2000 to operate as a traveling tent festival of National Football League ("NFL") personalities and football related interactive games. The attraction of the venture was to give NFL fans across the country the chance to experience the NFL firsthand. On Tour is believed to be a creation of the Bethesda, Maryland based entity, Super Entertainment Group ("SEG"), and the prominent sports agent, Leigh Steinberg, who, as his web-site points out, revolutionized the practice of sports management. Sports figures Troy Aikman and Warren Moon, Houston billionaire, Fayez Sarofim, and others made substantial equity investments and loans to the debtor. Some investors are said to hold secured claims.

On Tour was governed by an Operating Agreement that established an Operating Committee that included Leigh Steinberg, Patrice Jeffries, Brad Rothenberg, Allen Bloom, Randy Bloom (Allen's son), and Eric Holmund, some of whom are principals of SEG. Per an agreement entered into with On Tour, SEG was to be the General Manager of On Tour and Allen and Randy Bloom were to be the managing principals.

To get On Tour up and running, over $2 million of necessities such as lighting fixtures, banners, design services, interactive games, tents, and other goods and services were obtained from the Petitioning Creditors on credit. The Tour began August 2000, but came to a screeching halt, one month later for lack of ticket sales. The Petitioning Creditors then began to seek repayment, and the investors allegedly sought to secure their at-risk investments in On Tour by obtaining liens on its assets.

After the demise of On Tour in September, SEG was instructed by members of the Operating Committee and investors/secured creditors not to write any checks or distribute any cash on behalf of the debtor. The record reveals that the Operating Committee and investors/secured creditors subsequently held a meeting in October to

---

1. Bowman Design Group, F Space, Inc., Sports Design, LLC, Academy Tent & Canvas, AAA Flag & Banner, Hackley Design Associ- ates, Siteline Productions, Inc., and International Theatrical Truss.

figure out what went wrong with On Tour and to discuss strategy. The file contains allegations that On Tour failed due to the Blooms' and SEG's mismanagement and that the Operating Committee demanded their resignation. It is further alleged that the Blooms would not resign without first obtaining indemnification and releases from both On Tour and the investors.

In December 2000, while On Tour lay dormant, the investors/secured parties allegedly discussed among themselves a non-bankruptcy workout to pay the Petitioning Creditors a fraction of their claims and to keep them from contesting the liens on On Tour's assets. In the alternative, a filing of bankruptcy in California was proposed, where a purported bankruptcy and turnaround specialist would assume management responsibilities of the debtor and sell On Tour's assets to a new LLC.

Perhaps tired of remaining at bay, on March 13, 2001, the Petitioning Creditors filed an involuntary bankruptcy petition against On Tour. A summons was served on Allen Bloom. The involuntary petition and summons sparked communications and correspondence between SEG and the investors, but in keeping with its record, the debtor took no action until approximately June 2001, almost three months after the petition was filed.[2]

Four days before a response was due to the involuntary petition, on April 5, 2001, Randy Bloom wrote a letter to On Tour's

Operating Committee and several other parties, including Peter Munoz, reporting again of the involuntary petition and of the April 9, 2001, response deadline. The letter stated that the purported bankruptcy specialist had informed SEG that he would not represent the debtor in any proposed California bankruptcy case. Because of this, Mr. Bloom then asked for authority to answer the bankruptcy petition. Mr. Bloom also informed the Committee of SEG's intended resignation, as debtor's manager, effective April 9, 2001.

SEG received no response to Bloom's letter and no response was filed to the bankruptcy petition. SEG resigned as debtor's manager. This court entered an Order for Relief against On Tour on April 13, 2001. The court thereafter granted several motions by the Petitioning Creditors compelling the Blooms to answer discovery requests. No schedules were filed in this case and the court entered an Order Directing Officer or Agent of Debtor to File Chapter 7 Schedules A–J, Statement of Financial Affairs, and Mailing Matrix on May 11, 2001. This Order directed Allen Bloom, of SEG, to file the required information on behalf of the debtor.

On May 16, 2001, a meeting of creditors for the chapter 7 case was held pursuant to 11 U.S.C. § 341. Consistent with the history of this case, no one appeared in an official capacity on behalf of the debtor. In anticipation of the meeting of creditors, L & B filed the Verified List of Proxies

---

**2.** On March 15, 2001, SEG contacted Peter Munoz, a California attorney and the alleged counsel for the investors, to inform of the involuntary petition and to state SEG's assumption that Mr. Munoz's law firm would handle the bankruptcy case due to the proposed plan. *See supra.* SEG reiterated how they were precluded from engaging in any litigation for On Tour under On Tour's Operating Agreement. On March 28, 2001, Michael A. Isaacs, the designated attorney for the proposed voluntary bankruptcy filing in

California, wrote a letter to the Petitioning Creditors, explaining for the first time about the proposed California bankruptcy filing and asking whether they would agree to it. Also on March 28, 2001, the record shows that Mr. Munoz contacted SEG's counsel, Arnold & Porter, and stated that there would be no execution of the releases for the Blooms and SEG unless the bankruptcy case was dismissed or transferred to a California bankruptcy court.

and Statement of Facts and Proof of Claims for each petitioning creditor. There are no notes from this meeting of creditors.

On May 18, 2001, Allen Bloom and SEG filed a Motion for Reconsideration of the May 11, 2001, Order directing Allen Bloom and SEG to file On Tour's schedules, statement of affairs and mailing matrix. The motion stated that they resigned as managers of the debtor and had no resources or authority to file the schedules. SEG and the Blooms filed a supplemental motion, on May 22, 2001, stating that they were told that a new manager, John Robinson of the McShane Group,[3] had been hired by the debtor. The Petitioning creditors responded and asserted that SEG and Allen Bloom should remain compelled to file the schedules. The court did not decide this issue, because the Blooms and SEG filed the schedules and information on May 30, 2001. These papers included a conspicuous disclaimer as to the completeness and accuracy of the information disclosed.

On May 31, 2001, Brian Barkley entered an appearance as attorney for the debtor, and filed a motion to convert this case to chapter 11 that the court granted on June 4, 2001. Eight days later, the Petitioning Creditors filed the Motion for Immediate Appointment of a Chapter 11 Trustee or in the Alternative to Convert to a Case under Chapter 7 of the Bankruptcy Code ("Motion to Appoint Trustee").

The meeting of creditors for the chapter 11 case was held on June 25, 2001. John Robinson, the person testifying for the debtor pursuant to 11 U.S.C. § 343, was unable to answer any questions posed to him about the debtor, the debtor's financial situation, the control of the debtor, or about the alleged California bankruptcy plan or payoff of the Petitioning Creditors. Mr. Robinson's unfamiliarity with the debtor precipitated the filing of a motion to convert the case to one under chapter 7 by the United States Trustee.

On July 2, 2001, the debtor filed an opposition to the Petitioning Creditors' Motion to Appoint Trustee. The response blamed the Blooms for the delay in this case, addressed the liens obtained by the secured creditors, and stated that the debtor would hire a consultant to act as general manager to proceed with alacrity in the case. On July 9, 2001, SEG filed a response to the Motion to Appoint Trustee.

On July 10, 2001, this court held a lengthy hearing on the Motion to Appoint Trustee. Brad Rothenberg[4] and John Robinson were among the parties that testified on behalf of the debtor. At the end of the day, this court directed the appointment of a chapter 11 trustee. The court noted its concern of allowing the debtor to remain in control given its history of inactivity.

On September 25, 2001, the Petitioning Creditors filed the instant application seeking compensation of $53,866.47. On October 15, 2001, an objection was lodged by the Fayez Sarofim Partnership No. 5, L.P. ("FSP") arguing that compensation must be limited to fees and expenses in-

---

**3.** The McShane Group is a crisis management company in Baltimore, Maryland and was allegedly hired by the investors.

**4.** Brad Rothenberg is the representative of the investors/secured parties and has been the decision-maker for the Operating Committee.

Mr. Rothenberg stated that Peter Munoz represented On Tour, not the secured parties/investors. This assertion contradicts everything else in the record, including Mr. Munoz's own words, that he represents or represented the investors.

curred in connection with the actual filing of the involuntary petition, $3,679.00.

This matter came before the court for a hearing on January 8, 2002.

## DISCUSSION

■ *Applicable Legal Standards:*

11 U.S.C. § 503(b)(3) and (4) provides in relevant part:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

. . .

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection incurred by—

(A) a creditor that filed a petition under section 303 of this title;

. . .

(D) a creditor . . . in making a substantial contribution in a case under chapter . . . 11 of this title;

. . .

(4) reasonable compensation for professional services by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

11 U.S.C. §§ 503(b)(3)(A), (D) and § 503(b)(4). While the standards for awarding expenses under § 503(b)(3)(A) and § 503(b)(3)(D) differ, all applicants under § 503(b) have the burden of establishing their entitlement to an award by a preponderance of the evidence. *In the Matter of Baldwin–United Corporation,* 79 B.R. 321, 337 (Bankr.S.D.Ohio 1987)

(citations omitted). As with all fee applications, the instant application must be judged in accordance with 11 U.S.C. § 330. *Id.*

The Application seeks compensation and reimbursement for expenses for the period between March 1, 2001, and July 31, 2001 (the "Application Period"). During this time, L & B attorneys spent 306.20 hours of time at billing rates which ranged from $105.00 per hour to $250.00 per hour. Three issues must be decided with respect to the Application. First, the court must determine whether L & B is entitled to be awarded anything over and above fees and costs incurred in preparing and filing the involuntary petition in the period prior to conversion of the case. In other words, the court needs to ascertain whether there can be reimbursement for expenses and fees incurred during the Gap Period. Second, the court must determine whether counsel for the Petitioning Creditors made a "substantial contribution" to this case after it was converted to a case under chapter 11. Lastly, the court needs to address the merits of whether the work done and expenses incurred were excessive when judged by the customary criteria. The court will address each of these issues.

I. *L & B is entitled to be reimbursed under § 503(b)(3)(A) for its fees and costs incurred above and beyond those fees and costs expended in connection with the filing of the petition and entry of the Order for Relief*

■ Formerly, under § 64 of the Bankruptcy Act of 1898, there was authority for the view that only services actually rendered in preparing and filing an involuntary petition were deemed reimbursable. *See In re Hanson Industries, Inc.,* 90 B.R. 405, 410 (Bankr.D.Minn.1988) (citations omitted); *but see In re Diamond Fuel Co.,* 6 F.2d 773, 775 (C.A.2 1925) (fees granted

for sustaining adjudication of bankruptcy on appeal). Some cases decided after the enactment of the 1978 Bankruptcy Code are cited for the proposition that the narrow reading of the rights of petitioning creditors to compensation has carried forward into the Bankruptcy Code. *See e.g., In re J.V. Knitting Serv., Inc.*, 22 B.R. 543, 545 (Bankr.S.D.Fla.1982); *In re Seatrain Lines, Inc.*, 21 B.R. 194, 195–96 (Bankr. S.D.N.Y.1982). More recent authority rejects the notion that applications should be so limited and suggests that compensable services can be incurred up to the entry of the Order for Relief under § 503(b)(3)(A). *In re Crazy Eddie, Inc. ("Crazy Eddie")*, 120 B.R. 273 (Bankr.S.D.N.Y.1990); *In re William Stoecker*, 128 B.R. 205 (Bankr. N.D.Ill.1991).

FSP, first urges this court to accept the former line of cases which adopt the more conservative view, allowing reimbursement only to the extent of expenses incurred in filing the actual petition. Alternatively, FSP insists, under the guise of *Crazy Eddie*, that there can be no award of fees beyond April 13, 2001, the date this court entered the Order for Relief against On Tour. This results in L & B being limited to an allowance of $3,679.00 as an administrative expense and would leave its client, the Petitioning Creditors, to make up the difference of $50,187.47.[5]

In the totality of circumstances found in this case, it is inappropriate for this court to create a "black hole" in which the petitioning creditors be absolutely barred from the recovery of actual and necessary expenses as to the period from the entry of the Order of Relief on April 13, 2001, to the date of the entry of the order converting the case to a case under chapter 11 on June 4, 2001. The services rendered during this period manifestly made a substantial contribution to the progress of this case. Had the petitioning creditors not acted as they had, the debtor would not have filed its schedules and statement of financial affairs. The case would have remained stranded in legal limbo. What they accomplished was to implement the congressional policy found in § 503(b). As the Third Circuit explained in *Lebron v. Mechem Financial, Inc.*, 27 F.3d 937, 944–45 (C.A.3 1994):

We now turn to the statutory requirement that expenses be ones incurred "in a case under chapter 9 or 11." The Lebrons argue that this language expressly limits the authority conferred by § 503(b)(3)(D) to only those expenses that were incurred during the pendency of a chapter 9 or 11 case. In other words, they claim that this section authorizes only the recovery of expenses that are the result of efforts occurring after a petition for chapter 9 or 11 proceedings is filed, but before either the reorganization ends, or the case is converted to one under chapter 7 or 13.

We perceive a fallacy in this argument. It is the "substantial contribution," not the activity, that must occur "in a case" under chapter 11, and the Lebrons' argument assumes that activities conducted and expenses incurred before the filing of a chapter 11 petition cannot substantially contribute to the reorganization efforts during the pendency of a chapter 11 case. We believe the facts of this case, as found by the bankruptcy court, demonstrate that this assumption is not sound. The information generated by Scott's pre-petition

---

5. FSP would have the court overlook the fact that petitioning creditors are entitled to expenses under § 503(b)(3)(D), in a chapter 11 case, when there is a showing of "substantial contribution." This case was converted to a case under chapter 11 in late June 2001 and expenses are sought therefrom by L & B.

activities in this case materially assisted the trustee in carrying out his responsibilities in the chapter 11 proceedings. The court finds the approach of the Third Circuit a fairer reading of congressional intent than that found in *In the Matter of Seatrain Lines, Inc. ("Seatrain")*, 21 B.R. 194 (Bankr.S.D.N.Y.1982), that is often cited for the proposition that compensation for creditors filing involuntary petitions is severely limited. In *Seatrain*, the debtor consented to the Order for Relief. The applicant sought $37,500.00 in fees that was objected to by the United States Trustee as an unwarranted bonus. The court found that there was no support for a finding that the law firm's post-petition services rendered any substantial benefit to the estate. The court limited the law firm's compensation to those services connected with the preparation and filing of the involuntary petition. *Seatrain*, 21 B.R. at 196. This court would reach the same conclusion, based on the same facts, but it is uncontrovertible here that the applicants made a substantial contribution to the chapter 11 case through their activities while this case was under chapter 7.

The court will start with an analysis of the *Crazy Eddie* case to determine whether L & B is entitled to reimbursement of its fees and expenses incurred during the "Gap Period." In *Crazy Eddie*, an involuntary chapter 7 petition was filed against a publicly held corporation on June 5, 1989. Debtor immediately responded by filing a Dismissal and Sanctions Motion. The petitioning creditors prepared a response to the dismissal motion, but the matter never saw daylight because *Crazy Eddie* filed a voluntary chapter 11 petition, mooting the involuntary petition on June 20, 1989. Thereafter, the petitioning creditors filed a motion under § 503(b)(3)(A) and § 503(b)(4). In determining that the petitioners were entitled to compensation for more than just the preparation and filing of the involuntary petition, but not for expenses incurred after the entry of the Order for Relief, the court followed the reasoning of *In re Hanson Industries, Inc.* 90 B.R. 405, 410 (Bankr.D.Minn.1988):

> I also find that TBY & F is entitled to compensation for more than just the preparation and filing of the involuntary petition. I agree with the court's analysis in *In re Hanson Industries, Inc.*, 90 B.R. 405, 410 (Bankr.D.Minn.1988) which held that § 503(b)(3)(A) and (b)(4) include compensation for the preparation, filing, and *adjudication* of an involuntary petition. This reading of the Code recognizes that an involuntary proceeding can become an expressive and aggressively contested matter. *See Collier, supra* ¶ 7.04[1] at 7–14. A more limited interpretation of the Code is indeed "out of step with realities" of today's bankruptcy practice; it would be disingenuous to compensate for the filing of the petition but not its successful adjudication, particularly since the petitioning creditors are liable under § 303(i) if the case is abandoned or dismissed. *See In re Hanson*, 90 B.R. at 410, *quoting among other things, In re Baldwin*, 79 B.R. at 337. I agree that the "more reasoned approach in a case such as this is to allow fees and costs incurred [for the preparation and filing a petition] and, if there is opposition, to reasonable and necessary efforts to pursue the petition to successful conclusion...." *Hanson*, 90 B.R. at 410.

*Crazy Eddie*, 120 B.R. at 278.

However, what distinguishes the *Crazy Eddie* case from this case is that the debtor was active, identifiable, and forthcoming. The court now turns to consideration of *Hanson*, since it formulated the basis for the *Crazy Eddie* case and is perhaps the most widely cited case on this issue.

*In Hanson*, the Bank of New England, a creditor of the debtor, together with thirty-five of the debtor's former employees, filed a chapter 7 involuntary petition against the debtor on May 1, 1987. Rather than converting to chapter 11, debtor vigorously defended the petition. An Order for Relief was eventually entered by the court on July 23, 1987. Thereafter, the bank and the employees brought applications under § 503(b)(3)(A) and § 503(b)(4). The bank's application sought costs and fees incurred between April 24, 1987, and August 18, 1987.

The court in *Hanson* stated that § 503(b)(3)(A) provides for fees and costs incurred in "reasonable and necessary efforts to pursue the petition to successful conclusion by entry of the Order for Relief," and is widely cited for that proposition. Notwithstanding that the court expressly held that the petitioners were entitled to their expenses in their entirety, including reimbursement up to August 18, 1997, approximately one month after the court entered its Order for Relief, the *Hanson* case, like the *Crazy Eddie* case, involved an active debtor, a fact notably absent here.

The court also feels hard-pressed to discuss the case of *Indian Motocycle Apparel*[6] since it is cited in Collier's for the proposition that the entry of the Order for Relief is the cut-off point for the assertion of an administrative claim based on the commencement of an involuntary case. *See* COLLIER ON BANKRUPTCY, ¶ 505.10[2] (15th ed.2001). In *Indian Motocycle*, a chapter 7 involuntary bankruptcy petition was filed on July 15, 1993. The debtor, as in this case, did not respond. The Order for Relief was entered on August 16, 1993. On August 26, 1993, an interim trustee was appointed for the case and for a companion case. Ten days later, the debtor filed a

motion to vacate the Order for Relief, but withdrew the motion on September 29, 1993, rendering the Order for Relief final on that day. There also, the debtor's principal did not attend the meeting of creditors. However, the trustee was an active participant and the petitioning creditors assisted the trustee in administering the case. The petitioning creditors eventually brought an application under § 503(b)(3)(A) for legal services for the period June 1, 1993, through May 3, 1994.

In determining that the petitioning creditors were entitled to no reimbursement after the time when the Order for Relief became final, the court stated the following:

> "To the extent that the petition is contested by the alleged debtor, reimbursement of the petitioning creditors' expenses must also include legal services necessary to meet the challenge. *See In re Crazy Eddie, Inc.*, 120 B.R. 273, 278 (Bankr.S.D.N.Y.1990); *In re Hanson Industries*, 90 B.R. 405, 410 (Bankr. D.Minn.1988). However, once the Order for Relief enters and becomes final, legal services associated with the filing of the involuntary petition are completed. Additional services rendered after the entry of the Order for Relief are compensable *from the estate* only to the extent that counsel renders those services on behalf of the Trustee, after Court authorization."

*Indian Motocycle*, 174 B.R. at 662–63 (citations omitted).

The court finds that this blanket proposition comports neither with the facts of this case nor the purpose behind section 503(b). Section 503(b)(3)(A) serves to allow petitioning creditors their expenses in order to encourage them to bring the debt-

---

**6.** *Indian Motocycle Apparel and Accessories Co., Inc.*, 174 B.R. 659 (Bankr.D.Mass.1994).

or into court so that there may be equitable marshalling and distribution of its assets, before they are squandered by the debtor. *Hanson,* 90 B.R. 405, 410 (Bankr. Minn.1988) *(citing In re J.V. Knitting,* 22 B.R. 543, 545 (Bankr.S.D.Fla.1982)). The legal services incurred by L & B were necessary to bring this debtor into this court and that did not occur until June 2001. *See Indian Motocycle,* 174 B.R. at 662–63.

Unlike *Indian Motocycle,* there was no trustee actively participating in this case until the petitioning creditors moved for the appointment of a chapter 11 trustee, and unlike the *Crazy Eddie* and *Hanson* cases, the debtor here remained non-responsive to court orders. Although certain insiders are said to have liens on the assets of the debtor, allegedly obtained at a time when it was clear that the debtor was to shutdown, no one was willing to step up to bat, so to speak, for the debtor after the Order for Relief was entered. Merely obtaining an Order for Relief serves no purpose at all if the case goes nowhere. The court will not deny the eight Petitioning Creditors all fees and expenses incurred during the Gap Period, where they alone were responsible for the effective administration of this case for the 180 creditors scheduled.

Moreover, the absence of any participation by the chapter 7 trustee in this case makes the case much stronger. *Indian Motocycle,* 174 B.R. at 663 n. 2. In any event, the Petitioning Creditors "contributed substantially" to this case during the Gap Period, and their fees of $11,853.50 should not be disregarded merely because they were incurred after the entry of the Order for Relief.[7]

II. *Petitioning Creditors made a substantial contribution to this bankruptcy case and their efforts in running this case after the Gap Period are compensable under § 503(b)(3)(D)*

Sections 503(b)(3)(D) and 503(b)(4) allow reimbursement of fees and expenses where it is demonstrated that a creditor makes a substantial contribution to the bankruptcy case. Congress expressly limits reimbursement under § 503(b)(3)(D) to cases under chapter 9 or 11. Here, the case was converted to chapter 11 on June 4, 2001, and L & B seeks $35,460.00[8] in fees incurred after that date, including $3,598.00 for the filing of the instant Application and $2,873.97 in expenses. Accordingly, this courts turns to the consideration of whether the Petitioning Creditors substantially contributed to this case.

"Substantial contribution" is not a defined term in the Code. However, the term has been judicially interpreted to mean contributions to the bankruptcy case that "foster and enhance, rather than retard or interrupt the progress of reorganization." *In re Big Rivers Electric Corp.,* 233 B.R. 739, 746 (W.D.Ky.1998) *(quoting Hall Fin. Group, Inc. v. DP Partners, Ltd. Partnership (In re DP Partnership),* 106 F.3d 667, 672 (C.A.5 1997)); *Lebron v. Mechem Fin. Inc.,* 27 F.3d 937, 944 (C.A.3 1994); *In re Ace Fin. Co.,* 69 B.R. 827, 829 (Bankr. N.D.Ohio 1987); *In re Richton Int'l Corp.,* 15 B.R. 854, 856 (Bankr.S.D.N.Y.1981). The court in *Big Rivers* noted that "the term 'substantial' accommodates the section's twin goals of encouraging meaningful participation in the bankruptcy process while keeping fees and expenses minimal to maximize the estate for the creditors." *Id.,* at 746. *Lebron,* 27 F.3d at 944; *In re*

---

**7.** Whether the fees are in accord with section 330 requirements will be addressed shortly.

**8.** This figure includes L & B's voluntary deduction of $7,000.00

*Baldwin–United Corp.,* 79 B.R. 321, 338 (Bankr.S.D.Ohio 1987).

A leading definition of "substantial contribution," for purposes of services rendered in involuntary cases, is found in the case of *In re Paolino.*[9] There, the court held that the services must provide a "demonstrable benefit to the debtor's estate, the creditors, and, to the extent relevant, the stockholders," in order to be compensable. *In re Paolino,* 71 B.R. 576, 580 (Bankr.E.D.Pa.1987) (citation omitted). Here, L & B seeks reimbursement for three categories of services post conversion: (1) services rendered in connection with the appointment of the chapter 11 trustee; (2) services incurred in preparation and participation at the second meeting of creditors; and (3) fees incurred in preparation with the instant Application.

■ Creditors have been held to make substantial contributions in involuntary cases where their actions led to the appointment of a chapter 11 trustee. *In re Paolino,* 71 B.R. 576 (Bankr.E.D.Pa. 1987); *Catalina Spa & R.V. Resort, Ltd.,* 97 B.R. 13, 18 (Bankr.S.D.Cal.1989). Accordingly, fees incurred by L & B in connection with the Petitioning Creditors' efforts in securing a trustee are recoverable. How much L & B is entitled to will be discussed in the next section. With respect to L & B's request of $5,064.50 for fees incurred in the preparation and attendance at the chapter 11 meeting of creditors, this court has been unable to unearth any case that has allowed reimbursement under § 503(b)(3)(D) for this service. In denying administrative priority for this expense, courts reason that the service is self-interested and can be performed by others. *In re Catalina Spa & R.V. Resort, Ltd.,* 97 B.R. 13, 18 (Bankr.S.D.Cal.1989); *In re Woodhall,* 141 B.R. 700 (Bankr.D.Ariz.

1992). Here, the evidence shows that the United States Trustee was present and presided over the meeting of creditors. L & B's fees for this category are denied.

■ Prior to the passage of 11 U.S.C. § 330(a)(6) in 1994, courts were divided with respect to the allowance of compensation for the preparation and defense of fee applications. *See generally,* NORTON BANKRUPTCY LAW AND PRACTICE 2D § 26.9 (2001). This court had taken the majority position set out in cases such as *In re Nucorp Energy, Inc.,* 764 F.2d 655, 662 (C.A.9 1985), that bankruptcy counsel should be compensated for preparing and defending fee applications. That position is now contained in § 330(a)(6) of the Bankruptcy Code. This court sees no basis for applying a different rule when applying for compensation under 11 U.S.C. § 503(b) than used when applying for compensation under 11 U.S.C. § 330.

### III. *Whether the Petitioning Creditors' fees were actual, necessary, and reasonable*

■ If the court determines that services are compensable, it does not necessarily follow that the applicant is entitled to be compensated for all the hours expended. The question that the court now turns to is whether the fees and expenses of L & B are "reasonable . . . based on the nature, the extent and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title . . ." *In re Hanson Industries, Inc.,* 90 B.R. 405, 410 (Bankr.D.Minn.1988). The requirements under 11 U.S.C. § 330 for documenting how time was expended are applicable to fee applications filed under 11 U.S.C. § 503(b). *In re Stoecker,* 128 B.R. at 209; *In re Rorabaugh,* 62 B.R. 623 (Bankr.

---

**9.** 71 B.R. 576, 579–80 (Bankr.E.D.Pa.1987).

D.Kan.1986). This court has an obligation to review the entire pleading with the above criteria in mind. *In re Nucorp Energy, Inc.,* 764 F.2d 655, 658 (C.A.9 1985).

On the merits this Application is limited in time to the date between preparation of the petition, March 1, 2001, and the date when the Application was completed, July 31, 2001. Fees of $3,679.00 were incurred up to the date when the Order for Relief was granted, April 13, 2001. Courts have approved applications seeking more fees in this category. Therefore, this court finds the amount reasonable, and in fact the court finds the amount modest in light of the circumstances of the case. *In re Crazy Eddie,* 120 B.R. 273, 278 (Bankr. S.D.N.Y.1990); *In re Indian Motocycle and Accessories Company, Inc.,* 174 B.R. 659, 663 (Bankr.D.Mass.1994); *In re Paolino,* 71 B.R. 576, 582 (Bankr.E.D.Pa.1987).

For the Gap Period, the Petitioning Creditors incurred fees of $11,853.50. Services for this period included, *inter alia,* the filing of subpoenas and motions to examine the Blooms that this court granted; preparation and attendance at the first meeting of creditors; and an opposition to the Blooms' and SEG's motion for reconsideration. The court finds that all of these services rendered were necessary to this bankruptcy estate, including fees incurred for preparing and attending the first meeting of creditors. There is no evidence in the record that the interim chapter 7 trustee performed any duties in this case. The record does reflect, however, that after conversion to chapter 11, the U.S. Trustee filed a motion to reconvert the case back to chapter 7. This motion was the result of attending the second meeting of creditors, where it became clear that the debtor had no management

capabilities and had essentially done nothing in the case since the petition had been filed in March. Thus, the concern expressed in the *Catalina Spa case,*[10] of duplicative services, is not present because the Petitioning Creditors were running this case alone, at least to the point of the U.S. Trustee's motion filed in July, after the chapter 11 meeting of creditors. *See also In re Rorabaugh,* 62 B.R. 623, 627–28 (Bankr.D.Ky.1986) (denying fees where trustee also performed the services).

■ While L & B's efforts during the Gap Period were necessary, the court finds the fee for the Petitioning Creditors' Opposition to the Blooms' and SEG's Motion for Reconsideration excessive. L & B seeks $2,527.00 for the 3.5 page opposition. The court will reduce the amount allowed to $1,250.00. The other fees incurred during this period are reasonable, and are therefore allowed as administrative expenses.

■ For services incurred after the case was converted to chapter 11, L & B seeks fees of $35,460.00. The majority of these fees are for services incurred in connection with the appointment of a chapter 11 trustee. Specifically, L & B seeks $25,152.50 for 162.40 hours in connection with the appointment of the chapter 11 trustee.[11] While most courts have not granted fees to this extent, *see In re Stoecker,* 128 B.R. 205, 209 (Bankr.N.D.Ill. 1991); *but see Hanson,* 90 B.R. at 411, the circumstances herein support a finding that the amount requested is reasonable.

First, the complications faced by the Petitioning Creditors in bringing this debtor to court cannot be overstated. Second, the court ordered the appointment of a trustee in this case based on the efforts of the Petitioning Creditors. Third, the Peti-

---

**10.** *In re Catalina Spa & R.V. Resort, Ltd.,* 97 B.R. 13, 18 (Bankr.S.D.Cal.1989).

**11.** This figure incorporates L & B's voluntary deduction of $7,000.00.

tioning Creditors have researched the alleged liens of the secured creditors and presented evidence to question the validity of the liens. Finally, the detailed motion introduced relevant deposition testimony of Brad Rothenberg. The Petitioning Creditors argued that Mr. Rothenberg is not only a representative of the secured parties/investors, but also the decision-maker for this debtor. This allegation concerns the court. Moreover, the time spent at the hearing was not insignificant. The record of the hearing is ninety pages and lasted over two hours.

For the reasons set forth above, the court finds the amount requested reasonable and allowed as an administrative expense.

The court will also allow, as an administrative expense under § 503(b), the time expended by L & B in compiling a list of potential candidates for the trustee position. While the court directs the appointment of a trustee for a chapter 11 case, it is the duty of the United States Trustee to select the qualified candidate to serve in that role. The latter is accomplished using the procedures of Bankruptcy Rule 2007.1(c), that requires consultation with parties in interest regarding the appointment. Thus, fees of $1,645.00 for this service do demonstrably benefit the estate and are compensable. While *In re Stoecker*, 128 B.R. 205, 213 (Bankr.N.D.Ill.1991) is to the contrary, that case was decided before Rule 2007.1 took effect.

As stated in Section II of this opinion, the fee request of $5,064.50 for L & B's preparation and attendance at the chapter 11 meeting of creditors is denied.

The last two issues the court must address are (1) the reasonableness of the fees incurred for preparing the Application and (2) the expenses incurred by L & B in this case. With respect to the former, this court finds the fee excessive. As noted by FSP, the fee requested for the Application, $3,598.00, is only $81.00 less than the total fee requested from March 1, 2001, until April 13, 2001, the date the Order for Relief was entered. While there was a hearing on this matter, the hearing only lasted twenty minutes. The fee application, although detailed and in accordance with the lodestar standard, isn't overly complex to justify the fee. The court will reduce this fee to $2,500.00.

As to the latter, L & B requests reimbursement for expenses of $2,873.97.[12] This court takes the view that the concept of a reasonable attorneys's fee encompasses reasonable out-of-pocket expenses incurred by the attorney that are normally charged to the attorney's client. The policy of this court is to allow reasonable expenses incurred for photocopies, telecopies, postage, travel, research, and telephone charges. The court finds the requested amount reasonable. L & B also seeks reimbursement for deliveries of $197.86 and client advances of $474.99. Because there is no explanation for these expenses, and because the court will not superimpose and guess as to the appropriateness of the expenses to this bankruptcy case, they will be denied in their entirety. Compensation for expenses is hereby reduced to $2,201.12.

---

**12.** While L & B expressly requests this amount in the Application, L & B's charts reflect a higher amount, $2,891.97. The court will adhere to the Application request of $2,873.97.