In re SONICBLUE INCORPORATED,
Diamond Multimedia Systems, Inc.,
ReplayTV, Inc., and Sensory Science
Corporation, Debtors.

Nos. 03–51775, 03–51776, 03–
51777, 03–51778–MM.

United States Bankruptcy Court,
N.D. California.

Dec. 29, 2009.

William McGrane, Christopher Sullivan, McGrane & Greenfield LLP, San Francisco, CA, for Moving Creditor, SB Claims Holder LLC.

Aron M. Oliner, Geoffrey A. Heaton, Duane Morris LLP, San Francisco, CA, for the Post–Confirmation Creditors Committee.

Grant T. Stein, Alston & Bird, Atlanta, GA, Cecily A. Dumas, Friedman Dumas & Springwater LLP, San Francisco, CA, for the Chapter 11 Trustee, Dennis J. Connolly.

Nanette Dumas, Office of the United States Trustee, San Jose, CA, for the United States Trustee.

## OPINION AND ORDER ON SB CLAIMS HOLDER, LLC'S ADMINISTRATIVE CLAIM FOR SUBSTANTIAL CONTRIBUTION AND MOTION FOR ALLOWANCE THEREOF

MARILYN MORGAN, Bankruptcy Judge.

### INTRODUCTION

The reorganization of SONICblue, Inc. has been tragically marred by the misdeeds of professionals. Debtor's counsel settled claims against it for nearly $10 million. Committee counsel settled claims against it for nearly $5 million. Debtor's special counsel resolved claims against it by waiving approximately $750,000 in fees. Three senior noteholders relinquished at least $9 million in distributions as a result of their counsel's actions. The chief whistleblower and protagonist was SB Claims Holder, LLC and its predecessor, a claims trader, which has previously received $683,240.62 in awards for substantial contribution. SB Claims Holder now seeks an additional $300,000 for its contributions in the case, which the court awards as well earned. This opinion tells the story.

### FACTUAL BACKGROUND

The SONICblue story is not terribly complex and has only a handful of key players, but some background is required. SONICblue designed and marketed consumer electronic products. It filed a liquidating chapter 11 bankruptcy case on March 21, 2003. The debtor retained its longtime counsel Pillsbury, Winthrop, Shaw, Pittman, LLP as general bankruptcy counsel.

The Official Committee of Unsecured Creditors retained Levene, Neale, Bender, Rankin & Brill LLP as committee counsel. The committee membership included three institutional bondholders, Portside Growth & Opportunity Fund Ltd., Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd. (collectively the "2002 Noteholders"), who held $75 million in senior secured subordinated convertible debentures ("Senior Notes") that SONICblue issued a year prior to its bankruptcy. The 2002 Noteholders rapidly became the majority voice of the committee and, from the beginning, had separate counsel, Bruce Bennett of Hennigan, Bennett & Dorman.

Soon after filing, SONICblue auctioned off substantially all of its assets. However, a major hurdle to the proposal of a plan was an ongoing dispute between SONICblue and two other companies, VIA Technologies, Inc. and S3 Graphics Co., Ltd. Prior to bankruptcy, SONICblue and VIA had entered into a joint venture forming S3 Graphics to operate SONICblue's graphics chip business. SONICblue contributed critical graphics intellectual property rights that it held under a 1998 patent cross-license with Intel Corporation. A liquidated damages clause in the agreement entitled S3 Graphics and VIA each to liquidated damages of up to $70 million from SONICblue if S3 Graphics ever lost use of the Intel cross-license.

Following S3 Graphics' formation, a dispute arose between SONICblue and VIA regarding various accounting discrepancies and post-closing adjustments (the "books and records dispute"), and it remained unresolved on the petition date. Then, in June 2003, Intel Corporation sought relief from the automatic stay to terminate its patent cross-license with SONICblue. VIA and S3 Graphics filed duplicate proofs of claim, seeking $35 million for the books and records dispute and another $70 million in liquidated damages.

In light of the size of VIA's and S3 Graphic's claims, SONICblue deferred proposing a plan to explore resolution of the claims and Intel's related attempts to terminate the patent cross-license. 2 Pillsbury retained primary responsibility for the VIA matter, but due to a conflict of interest, it arranged for O'Melveny & Myers LLP to serve as special litigation counsel on all Intel related matters. Suzzanne Uhland, an O'Melveny partner, assumed the lead with respect to Intel and later took on a prominent role in settling the VIA dispute.

### VIA Settlement and Non–Disclosure of Special Interests

For the next three years, Pillsbury and O'Melveny put considerable effort into resolving the VIA and Intel matters. Bruce Bennett, representing the 2002 Noteholders, also became intimately involved even though his clients were not parties to either the VIA or the Intel dispute. Bennett used his clients' controlling position on the creditors' committee to gain access to high level strategic discussions regarding both disputes. He was a regular on the call list for conferences and, at times, participated as the sole creditor representative in key negotiations. While Bennett later testified that he never represented the 2002 Noteholders in their capacity as members of the committee, his extraordinarily high level of involvement created the opposite perception—that he was acting as a special envoy for the committee—and he did not dispel that belief.

Years later, the reason for Bennett's acute interest in the VIA litigation became apparent. Only in hindsight and through discovery was his agenda in the negotiations revealed. A contractual provision in the Senior Notes indenture subordinated payment of the Senior Notes to certain

"Senior Indebtedness," which was broadly defined to include:

> All indebtedness of [SONICblue] due and owing to Via Technologies, Inc. in an aggregate principal amount not to exceed $15,000,000.

In light of this provision, there was a very real risk that the 2002 Noteholders' claims might be junior to any claim of VIA. Bennett's concern was validated within the first month of SONICblue's bankruptcy when he received a copy of a liquidation analysis prepared by SONICblue's financial advisors, Houlihan Lokey Howard Zukin Capital. The analysis reflected that any claim by VIA against the estate had a $15 million senior component with priority in right of payment over the 2002 Noteholders' claims.

Suzzanne Uhland also was aware of Houlihan Lokey's analysis and had participated in several discussions where the senior component to VIA's claim was acknowledged. Although she was special counsel only as to Intel matters, Uhland thought the provision was unusual and decided to ask SONICblue's former general counsel about the origin of VIA's seniority rights. In June 2004, Uhland met with general counsel as well as a Pillsbury litigation partner and Bennett to prepare for initial settlement discussions with VIA and Intel. At the preparation session, Uhland asked if general counsel had any understanding as to why the Senior Notes indenture would provide up to $15 million of VIA indebtedness with priority over the Senior Notes. General counsel casually responded that around the time of the indenture negotiations, SONICblue and VIA had been involved in settlement discussions concerning the books and records dispute and, at one time, those discussions included a possible $15 million working capital loan from VIA to SONICblue that had never been consummated. Although he did not say so explicitly, Uhland interpreted general counsel's comments to mean that any senior component to VIA's claim likely was limited to the $15 million loan that never materialized. Bennett was present for the explanation but did not comment.

More than a year later, in August 2005, settlement discussions regarding the VIA dispute were taken up in earnest. By this time, SONICblue had formally objected to the VIA and S3 Graphics claims and had filed an adversary complaint against both companies asserting breaches of the joint venture agreement. Bennett, not surprisingly, had continued his prominent position in discussions between the debtor and the committee regarding both claims. VIA proposed a global resolution of the VIA/S3 Graphics claims along with the Intel cross-license dispute through a single allowed claim of $42.5 million with an assignment of SONICblue's rights against Intel. Pillsbury notified O'Melveny, Bennett, and Levene Neale of VIA's global settlement overtures and solicited their input. Levene Neale responded that the committee would support any settlement for an allowed claim of $25 million or less. Uhland and Bennett thought a lower number was attainable.

After further negotiations between Pillsbury, O'Melveny, VIA's counsel and Bennett, it was agreed that all counsel would seek authority to settle for a single allowed claim in the amount of $12.5 million, which VIA and S3 Graphics could then allocate between the two companies. By Friday, September 16, 2005, the debtor, VIA, and S3 Graphics had all agreed to the $12.5 settlement amount. Levene Neale, also pleased with the $12.5 million figure, made the committee's consent contingent on Bennett's approval. As a result, Al Boro, a Pillsbury litigation partner handling the VIA matter, and Uhland telephoned Ben-

nett to discuss the $12.5 million proposal. Bennett agreed to call them back after speaking with the 2002 Noteholders. Up to this point, there is no evidence indicating that anyone discussed or identified any issue concerning the priority of the VIA claim in relation to the 2002 Noteholders' claims.

Shortly after their call to Bennett, Boro separately telephoned Uhland and wondered aloud whether Bennett knew that the Senior Notes indenture would make the $12.5 million VIA claim senior to the 2002 Noteholders' claims. According to Uhland, Boro's comment "came out of the blue" because no one had mentioned the Senior Indebtedness issue since her June 2004 conversation with SONICblue's general counsel. Although Uhland knew that her interpretation of his remarks was not definitive and was contrary to the financial advisor's conclusion that VIA's claim had a senior component, she resurrected the observations about an unconsummated loan and argued that any claim resulting from the VIA settlement would not be senior to the 2002 Noteholders' claims because the indenture's subordination provision only applied to borrowed money from an unconsummated loan.

Curiously, over the intervening weekend, Uhland privately raised the VIA senior indebtedness issue with Bennett. First, in a Saturday afternoon email, Uhland told Bennett that Boro had wondered whether Bennett knew that the VIA claim was senior to the 2002 Noteholders' claims. She assured Bennett that she had explained to Boro that "we" had already been through the issue with general counsel and that she had convinced Boro that the Senior Indebtedness provision only applied to borrowed money. The next morning, Bennett's retorted, "Its nice to know that Pillsbury thinks that the bondholders are represented by a moron."

Early Monday morning, September 19, 2005, Bennett sent a second response to Uhland's email about her call from Boro. Ignoring Pillsbury's primary role in the VIA matter, Bennett instructed Uhland to call him because he had received direction from his clients. Bennett advised Uhland that the $12.5 million claim amount was acceptable to the 2002 Noteholders, but only if they could reach some clarity that the VIA claim "is not for borrowed money or anything else that might constitute senior debt." That evening, Uhland's associate advised Boro that subject to "other issues," the 2002 Noteholders' agreed to the $12.5 settlement amount.

With the 2002 Noteholders' acceptance, the compromised amount of VIA's claim was fixed on September 20, 2005. Nonetheless, discussions continued regarding the seniority of the claim. Uhland, despite her limited role as special counsel, claimed the lead for the estate in drafting a settlement term sheet, leaving Pillsbury in a supporting role. Further, the committee adopted a hands-off approach. As Levene Neale partner, Craig Rankin, explained,

> [Uhland] was our lawyer. She was the estate's lawyer. She was paid a lot of money to be the estate's lawyer and she insisted on being in charge because that's the way she operates.

As the primary drafter, Uhland continued to work closely with Bennett, and they crafted language providing that the $12.5 million claim for damages was "neither senior nor junior to any other general unsecured claim." However, no additional consideration from the 2002 Noteholders was offered for this concession.

After receiving Uhland's draft term sheet, counsel for VIA and S3 Graphics suggested deleting the neither senior nor junior language from the term sheet out of concern that other creditors would benefit at their clients' expense. In response,

Bennett and Uhland fanned out to promote their $15 million unconsummated loan theory. Bennett contacted Boro to reinforce Boro's earlier conversation with Uhland as to why VIA's $12.5 million claim was not "indebtedness" within the meaning of the Senior Notes indenture. Meanwhile, Uhland explained to VIA's bankruptcy counsel that there was no real benefit to the 2002 Noteholders because the subordination of the Senior Notes only applied to an unconsummated $15 million loan. In so doing, they attributed an anomalous interpretation to the otherwise broad language in the indenture. Thereafter, VIA and S3 Graphics agreed to the neither senior nor junior language.

Boro forwarded the final term sheet both to Bennett and Levene Neale on September 27, 2005. In a conference call later that day, no one brought the Senior Indebtedness issue to Levene Neale's attention, and the committee approved the settlement terms.

Because the three-way settlement agreement required a release from Intel, the formal agreement was not finalized until September 2006. In drafting the actual settlement agreement, Pillsbury attorneys 6 suggested that the neither senior nor junior language be revised to state specifically that VIA's allowed claim did not constitute Senior Indebtedness under the indenture. Having been convinced that the subordination provision only applied to a $15 million loan that never materialized, they wanted to foreclose any future litigation over the priority of VIA's allowed claim. From June 1, 2006 onward, the settlement agreement contained the following language suggested by Pillsbury:

> Claimants and the Debtor agree that the Allowed Claim is not, and shall not be treated as, "Senior Indebtedness" under the terms of the Debtor's Indenture, dated as of April 22, 2002, for the 7–¾

Secured Senior Subordinated Convertible Debentures due 2005.

When Levene Neale partner Craig Rankin received the lengthy and complex settlement agreement in late September, he asked Uhland to verbally walk through its salient terms. Rankin was confident that Uhland would bring any issues or unusual provisions to his attention:

> I one hundred percent thought if something came up that was unique to [Bennett's] position that Suzzanne Uhland would tell me.
>
> * * * *
>
> In the context of the VIA litigation I would have expected Suzzanne Uhland first to tell me.

In an October 4, 2006 conference call that also included Bennett, Uhland reviewed the settlement agreement with Rankin and his partner. Neither Uhland nor Bennett mentioned VIA's waiver of Senior Indebtedness status under the indenture. Rankin recalls asking Bennett whether he wanted Levene Neale to study the agreement in detail or whether they should rely on Uhland. Without advising Rankin that he only represented 2002 Noteholders individually, not as members of the committee, or that his clients solely benefitted from the waiver, Bennett instructed Rankin to rely on Uhland. Of course, later discovery uncovered internal notes in the possession of Pillsbury's corporate lawyers as well as the 2002 Noteholders' counsel indicating that the definition of Senior Indebtedness in the indenture was deliberately drafted broadly to provide SONICblue with flexibility to settle the books and records dispute.

### Opinion Letter and Non–Disclosure of Indemnification Demand

While the VIA and Intel matters were being resolved, Pillsbury and Levene Neale split the prosecution of avoidance ac-

tions and other objections to claims between their two firms. Undertaking the more complex matters, Pillsbury assumed responsibility for examining the claims of the 2002 Noteholders. Early on, Pillsbury identified an objection based on an original issue discount (OID) granted to the 2002 Noteholders, *i.e.*, the difference between the face amount of the notes and the amount actually paid for them. Due to "political sensitivity," Pillsbury did not file this objection immediately.

On July 20, 2006, when the VIA settlement agreement was in its final drafting stages, a Pillsbury bankruptcy associate sent an email to Bennett asserting that $43 million of the 2002 Noteholders' claims might be subject to disallowance to the extent the OID constituted unmatured interest on the petition date. On August 24, 2006, Bennett replied to the Pillsbury bankruptcy partner in charge of this case, Craig Barbarosh. Bennett advised Barbarosh that Pillsbury had issued an opinion letter to the 2002 Noteholders in connection with the issuance of the Senior Notes. Although probably the result of a scrivener's error, the April 2002 letter stated without qualification that the Senior Notes were valid, binding obligations of SONICblue and were enforceable according to their terms, even in bankruptcy. Bennett warned that the 2002 Noteholders would seek indemnification from Pillsbury for any loss caused by an objection to their claim. On September 5, 2006, Bennett's partner followed up with a written demand for indemnification describing the claims that the 2002 Noteholders would pursue against Pillsbury if the full principal amount of the Senior Notes were not recovered through the bankruptcy case.

The day after receiving the written indemnification demand, Pillsbury notified Levene Neale of the 2002 Noteholders' threats. Despite the dominance of the 2002 Noteholders on the committee, Pillsbury turned over, and committee counsel accepted, responsibility for prosecuting the objections to the 2002 Noteholders' claims. Neither Pillsbury nor Levene Neale disclosed the indemnification demand by the 2002 Noteholders or the fact that committee counsel had assumed responsibility for prosecuting objections to claims of the committee's controlling members.

### Motion to Approve VIA Settlement & Non–Disclosure of VIA's Waiver

After the VIA settlement agreement was finalized in late September 2006, Pillsbury prepared a motion to approve the compromise to be set on the earliest possible court calendar. The day before the motion had to be filed and served to preserve an early hearing date, Pillsbury forwarded the moving papers to Uhland and her associate, who worked late into the night adding revisions so substantial that he subsequently characterized himself as the primary drafter. No draft, including the filed version of the motion, mentioned, much less discussed, VIA's waiver of its Senior Indebtedness status under the provisions of the Senior Notes indenture.

Pursuant to a confidentiality agreement, the original moving papers, including a copy of the settlement agreement, were filed under seal. The notice sent out to creditors summarized the basic terms of the settlement, but again failed to mention VIA's waiver of its priority status. No opposition to the motion was filed. At the October 27, 2006 hearing, no one disclosed that VIA had seniority rights over the 2002 Noteholders or that the settlement terms included a waiver of VIA's right to senior status. The court approved the VIA settlement.

### Disclosure Statement and Non–Disclosure of Conflicts and the VIA Waiver

Once the court approved the VIA settlement, Levene Neale took the lead in pre-

paring a disclosure statement and plan of reorganization. The initial disclosure statement filed by the committee amended previous Pillsbury drafts to omit reference to VIA's priority rights or its waiver of those rights. The disclosure statement included a cryptic mention of a conflict between Pillsbury and the 2002 Noteholders, but provided no details. It also acknowledged that committee counsel was handling objections to the claims of the 2002 Noteholders, but it failed to note that those same 2002 Noteholders were controlling members of the committee.

In early January 2007, SB Claims, LLC, the predecessor of SB Claims Holder, learned that VIA had waived its seniority rights vis á vis the 2002 Noteholders as part of the VIA settlement. Through the objections to the disclosure statement and the amendments that followed, the court learned of Pillsbury's disabling conflict of interest that arose out of the 2002 Noteholders' demand for indemnification. It also learned that the 2002 Noteholders were the controlling members of the committee, which raised additional questions regarding the propriety of committee counsel's pursuit of objections to the 2002 Noteholders' claims. The objections further highlighted disclosure issues surrounding the VIA settlement and VIA's apparent waiver of its right to seniority over the 2002 Noteholders' claims. At a January 23, 2007 hearing on the amended disclosure statement, committee counsel asserted that the committee first learned of VIA's Senior Indebtedness waiver from the objections to the disclosure statement.

### Appointment of a Trustee

Three weeks later, in mid-February 2007, the United States Trustee moved to appoint a chapter 11 trustee and to disqualify Pillsbury for its failure to disclose its conflict with the 2002 Noteholders. SB Claims joined in the request to disqualify Pillsbury. Following a lengthy hearing, in which SB Claims shared information about Pillsbury's conflict of interest and the 2002 Noteholders' hidden agenda behind the VIA settlement, the court disqualified Pillsbury from representing SONICblue and appointed a chapter 11 trustee.

Upon his appointment, the chapter 11 trustee, Dennis J. Connolly of Alston & Bird, began an investigation of the apparent improprieties that had transpired in the case. Meanwhile, SB Claims acquired the $12.5 million VIA claim and launched its own investigation. A few months later, SB Claims asked the court to modify or partially vacate the order approving the VIA/Intel settlement. Although the motion, if granted, clearly would have served SB Claims' interest by neutralizing the effect of VIA's relinquishment of its senior status, it also benefitted the estate by moving the parties toward mediation and settlement. SB Claims further asked the court to reconstitute the creditors committee to eliminate the 2002 Noteholders' control over committee decisions. That led to a new, independent committee membership and new committee counsel who worked closely with the trustee throughout the remainder of the case.

In late March 2008, with the investigations winding down, the trustee, along with the reconstituted creditors committee, filed yet another plan and disclosure statement. Within days, the trustee also filed three separate adversary proceedings against the 2002 Noteholders, Pillsbury and Levene Neale. The adversary proceedings revealed further embarrassing allegations of shortcuts and omissions by the estate's professionals. The trustee discovered that SONICblue's insurers denied coverage for litigation alleging that SONICblue's officers and directors breached fiduciary duties while in the zone of insolvency. The insurers disputed coverage because of

inadequate disclosures approved by Pillsbury. Based on the insurance carriers' refusal to provide coverage, counsel for the officers and directors demanded, and Pillsbury signed but did not disclose, an agreement tolling the statute of limitations for any claims that the officers and directors might have against Pillsbury. In addition, the trustee uncovered that Pillsbury failed to disclose or return $1.3 million in preferential payments under *In re Pillowtex, Inc.*, 304 F.3d 246 (3d Cir.2002), that it received for its services in the months prior to bankruptcy. Even though there was no defense to the preference claims, Levene Neale persuaded the committee not to pursue recovery from Pillsbury. Simultaneously, Levene Neale wrote to Pillsbury explaining how to avoid *Pillowtex* preferences in the future. The trustee also alleged that Levene Neale failed to insure that the committee complied with formalities concerning its by-laws and operations. Further, both Pillsbury and Levene Neale failed to have SONICblue renew its directors and officers insurance policy and, as a result, SONICblue's ability to pursue any claims covered under the policy was impaired.

In the face of the trustee's new plan and the adversary complaint against them, the 2002 Noteholders filed a competing plan. Then SB Claims filed its own plan. Minutes before the hearing on all three plans, the trustee reached a settlement with the 2002 Noteholders and provided a settlement term sheet. However, when the terms were more fully described in an amended disclosure statement, the trustee could not adequately explain how the settlement with the 2002 Noteholders was fair and equitable to the estate in light of the deeply discounted amounts proposed. Subsequently, the parties, including SB Claims, reached a global settlement and the plan as modified was confirmed in October 2008. Through this process, Bennett's clients relinquished more than $9 million in distributions from the estate. Thereafter, the trustee was able to negotiate settlements of the adversary complaints against Pillsbury and Levene Neale.

### O'Melveny's Final Fee Application

Following confirmation of the plan, O'Melveny filed its fifth and final application for fees based on the work that it had performed related to the VIA/Intel settlement. The trustee opted not to sue O'Melveny, but the post-confirmation committee gave O'Melveny's fee request a hard look. Initially, the committee negotiated a $500,000 reduction, but SB Claims Holder objected to an award in any amount. Based on unresolved factual issues whether O'Melveny's conduct constituted misfeasance, malfeasance or neither, the court set an evidentiary hearing to determine whether O'Melveny was entitled to further fees or whether it would have to disgorge fees already received.

Counsel for SB Claims Holder served as lead counsel with counsel for the post-confirmation committee in the two-day evidentiary hearing. Together, their work led to a resolution following the close of evidence in which O'Melveny withdrew its pending fee application. This resolution benefitted the estate by approximately $750,000.

### LEGAL DISCUSSION

 The Bankruptcy Code expressly authorizes the recovery of reasonable attorneys' fees and expenses by a creditor whose participation provided a substantial contribution in a bankruptcy case. 11 U.S.C. § 503(b). The principal test for substantial contribution under § 503(b)(3)(D) is the extent of the benefit to the estate. *In re Cellular 101, Inc.*, 377 F.3d 1092, 1096 (9th Cir.2004); *In re Christian Life Center*, 821 F.2d 1370, 1373

(9th Cir.1987). Mere participation in a case, even if extensive, may not be sufficient to constitute substantial contribution. *In re Best Products Co., Inc.*, 173 B.R. 862, 866 (Bankr.S.D.N.Y.1994). Services that substantially contribute to a chapter 11 case are those that foster and enhance, rather than retard or interrupt, the progress of reorganization. *Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.)*, 785 F.2d 1249, 1253 (5th Cir.1986), *cited in, Cellular 101*, 377 F.3d at 1096–97. *See also In re On Tour, LLC*, 276 B.R. 407, 417 (Bankr.D.Md.2002). The applicant has the burden of establishing an entitlement to an award under § 503(b) by a preponderance of the evidence. *In re Crazy Eddie, Inc.*, 120 B.R. 273, 278 (Bankr.S.D.N.Y.1990). Under the particular facts of this case, SB Claims Holder has met its burden.

The court previously awarded SB Claims Holder administrative expenses of $683,240.63, a sum negotiated between SB Claims and the trustee, based on its substantial contributions through plan confirmation. SB Claims Holder now seeks allowance of an additional $300,000 in fees and expenses incurred in challenging O'Melveny's application for a final award of compensation and expense reimbursement. In a case riddled with wrongdoing by fiduciaries, one gnawing question remained: whether Uhland collaborated to conceal from the committee and the court the waiver in the VIA settlement, which solely benefitted the 2002 Noteholders. The trustee, in the exercise of his business judgment, chose not to challenge O'Melveny for its role in obtaining court approval of the VIA settlement. However, there were disquieting conflicts in the evidence underlying the origin of the waiver, the development of the language in the VIA settlement, how the 2002 Noteholders obtained such a substantial benefit without paying any consideration and the nondis-

closure to other parties and the court. SB Claims Holder insisted that an evidentiary hearing was necessary, and the court agreed.

Counsel for SB Claims Holder, McGrane Greenfield LLP, brought its considerable experience and energy as a civil litigation firm to bear in trial preparation and the trial itself. The firm was hawkish and exacting in the development of both the legal theories and the evidence; the firm also lent to the proceedings its depth of knowledge honed in its own investigation of the VIA claim. Counsel for the post-confirmation committee acknowledged and relied on McGrane, Greenfield's well-developed expertise, explaining to the court:

> I'm very mindful of the fact that [McGrane, Greenfield] carried a laboring oar to this point. And if we're talking about an evidentiary hearing with three or perhaps more witnesses in October, I'd like to have Mr. McGrane at the party. And he should be paid.

At the two-day evidentiary hearing, attorneys William McGrane and Christopher Sullivan subjected Uhland and Bennett to the same in-depth prodding that had already uncovered so many disturbing facts regarding other estate fiduciaries. Through their efforts, SB Claims Holder proved to be a vital force in developing the record more fully to assist the court in its determination of the propriety of a fee award to O'Melveny. After the close of evidence, the parties reached a resolution where O'Melveny relinquished its rights to $750,000 in unpaid fees, but retained $1,111,682.80 that it had already received.

Under the troubling circumstances of this case, SB Claims Holder's contribution can be measured in more than purely monetary terms. At the point when the chapter 11 trustee was appointed, creditor confidence had been deeply impaired by the

revelations of the undisclosed waiver and Pillsbury's conflict with the 2002 Noteholders. Investigations had revealed the multiple other misdeeds and omissions recited above. Still, much of the story remained mere conjecture until Uhland and Bennett testified under oath. SB Claims Holder's participation cast a bright light on Uhland's and Bennett's roles, which had not previously been exposed to scrutiny. The court is now left with the firm impression that the most plausible explanations for Uhland's conduct are expediency and the cultivation of relationships within the close-knit referral circle among bankruptcy practitioners. Bennett's conduct, however, violated the trust and confidence of those around him and was detrimental to the effective operation of the bankruptcy system.

■ Having determined that SB Claims Holder's involvement has substantially contributed in assuring the integrity of the reorganization process as well as the progress of the case, the remaining issue is whether counsel's fees are reasonable and the expenses actual and necessary. The requested $300,000 award is, again, a compromise that is substantially lower than the actual fees and costs that SB Claims Holder incurred in pursuing its objection to O'Melveny's application. It does, however, constitute reasonable compensation for the actual and necessary expenses incurred by SB Claims Holder in objecting to O'Melvney's fees. Together with the prior amounts awarded to SB Claims Holder, it represents but a fraction of the value that SB Claims Holder's substantial contributions have brought to this case.

#### CONCLUSION

For the reasons stated, SB Claims Holder is allowed an administrative claim pursuant to §§ 503(b)(3) and (4) in the total amount of $300,000.00 for fees and expense reimbursement.

Good cause appearing, IT IS SO ORDERED.